UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRIGITTE JAHNER, as personal representative of THE ESTATE OF ROBERT BEAR SHIELD; JERRY BEAR SHIELD, SR.; JERRY BEAR SHIELD, JR.; JAYDEE SPOTTED ELK; AMERICAN ZURICH INSURANCE COMPANY; AND  HEAVY CONSTRUCTORS INC.;<br><br>                    Plaintiffs,<br><br>        vs.<br><br>KUMHO TIRE U.S.A., INC.;  KUMHO TIRE MERGER SUBSIDIARY, INC.; KUMHO TIRE CO. INC.; KUMHO TIRE (VIETNAM) CO., LTD.;<br><br>                    Defendants. | 5:18-CV-05036-JLV<br><br><br>REPORT AND RECOMMENDATION<br><br>AS TO KUMHO TIRE CO. INC.'S MOTION TO DISMISS<br><br>DOCKET NO. 79 |

**INTRODUCTION**

This matter is before the court on the amended complaint of plaintiffs American Zurich Insurance Company and Heavy Constructors, Inc. (collectively "Heavy"). See Docket No. 12 in 5:19-cv-5044.[1]  Jurisdiction is premised on the diverse citizenship of the parties and an amount in controversy exceeding

---

[1] Heavy originally filed its complaint as a separate matter in American Zurich Ins. Co. v. Kumho, 4:19-cv-5044 (D.S.D.).  That case was ordered consolidated with Bear Shield v. Kumho, 4:18-cv-5036 (D.S.D.) on July 30, 2019, because both cases involved actions for damages from an allegedly defective tire arising out of the same motor vehicle accident.  The original plaintiffs in the Bear Shield case are not involved in the currently pending motion that is the subject of this opinion.  Following the consolidation order, all pleadings are now being filed in 4:18-cv-5036.  All references to docket numbers in this opinion are to the consolidated case number unless otherwise noted.

$75,000.  Id. at p.4, ¶ 16.  Now pending is a motion by defendant Kumho Tire

Co., Inc. ("KTCI") seeking its dismissal from this lawsuit on the basis that the

statute of limitations has run, there is no federal jurisdiction over Heavy's

Magnuson-Moss Warranty Act claims, and there is no personal jurisdiction

over this defendant.  See Docket No. 79.  This motion was referred to this

magistrate judge for a recommended disposition pursuant to 28 U.S.C.

§ 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable

Jeffrey L. Viken, United States District Judge.

## FACTS

### A.    Facts Pertinent to Statute of Limitations Argument

A motor vehicle accident giving rise to the claims in this lawsuit occurred

June 22, 2016.  Occupants of the vehicle were injured and killed.  Heavy and

Zurich paid out monies on account of the accident which they now seek to

recoup in this lawsuit on the theory that a defective Kumho tire on the motor

vehicle caused the accident.  Heavy's amended complaint asserts claims for

negligence and strict liability (counts I – III), for breach of express warranty

under state law (count IV), and for breach of implied warranty under both state

law and the Magnuson-Moss Warranty Act, a federal law (counts V & VI).  See

Docket No. 12, 5:19-cv-5044.

Heavy's state law claims are governed by a three-year statute of limitations. See SDCL § 15-2-12.2. That statute of limitations ran on June 22, 2019.[2]

Heavy filed its initial complaint in this court on June 17, 2019, five days before the three-year statute of limitations would have expired. See American Zurich Ins. Co. v. Kumho, 4:19-cv-5044 Docket No. 1 (D.S.D.). That original complaint named KTCI as a defendant and alleged KTCI was the parent corporation for codefendant Kumho Tire U.S.A., Inc. ("KTUSA"). The original complaint alleged that KTCI designed, manufactured, sold, distributed, and supplied motor vehicle tires in the United States and South Dakota. Id. at pp. 1-2, ¶ 4.

On June 18, 2019, Heavy delivered the original summons and complaint to Legal Language Services for translation and service upon KTCI pursuant to the Hague Convention. See Docket No. 101 at p. 1, ¶ 2. Legal Language Services delivered the original summons and complaint to the Hague Central Authority for Korea on July 18, 2019. Id. at p. 1, ¶ 3. The original complaint and summons, along with Heavy's amended complaint, were not served upon KTCI until January 29, 2020. Id. at pp. 1-2, ¶ 4.

---

[2]The breach of express and implied warranty claims are governed by a four-year statute of limitations that runs from the date of the delivery of the product. See SDCL § 57A-2—725. The parties have not indicated what the date of the delivery of the accident tire in this case was, but both agree all state law causes of action are governed by the three-year statute of limitations in SDCL § 15-2-12.2. The court accepts their argument without so holding. See BNSF Ry. Co. v. L.B. Foster Co., Inc., 917 F. Supp. 2d 959, 975 (D. Neb. 2013).

KTUSA, a domestic corporation, was served with the original complaint on June 24, 2019.  Id. at Docket No. 4, 5:19-cv-5044.  KTUSA filed an answer on July 15, 2019, denying that KTCI manufactured the accident tire.  Id. at Docket No. 9, 5:19-cv-5044.  The parties held their Form 52 planning meeting thereafter and only defendant KTUSA appeared at the meeting and participated in it.  See Docket No. 27.

Heavy filed an amended complaint on July 26, 2019, in which it added defendant Kumho Tire (Vietnam) Co., Ltd. ("Kumho Vietnam") and alleged that Kumho Vietnam manufactured the accident tire.  Docket No. 12 at p. 2, ¶ 6, 5:19-cv-5044.  Despite alleging that Kumho Vietnam manufactured the tire involved in the accident at the heart of this case, Heavy continued to also allege that KTCI manufactured the accident tire.  Id. at pp. 1-2, ¶ 4.

Heavy alleges KTCI had actual notice of this lawsuit prior to service of process being effectuated on it.  On February 19, 2020, KTCI filed a notice that Heavy had granted it an extension of time to file an answer.  See Docket No. 73.  In lieu of filing an answer, KTCI then filed the instant motion to dismiss pursuant to FED. R. CIV. P. 12(b).  See Docket No. 79.

## B.    Personal Jurisdiction Facts

The facts alleged by the parties are summarized here, with additional specific facts discussed in the legal analysis of KTCI's personal jurisdiction argument.  KTCI itself has no contacts with the state of South Dakota.  KTUSA

4

is the only entity that has actual contacts with the state.[3]  Heavy stakes its claim to personal jurisdiction over KTCI in South Dakota on the fact that South Dakota has personal jurisdiction over KTUSA and the relationship between KTUSA and KTCI is such that it comports with due process for this court to also exercise jurisdiction over KTCI.

Among the facts urged by Heavy regarding the relationship between the two entities are the fact that KTCI owns all of the stock in KTUSA.  Both companies are insured under one liability insurance policy for both defendants with one premium charged for the policy.  The two corporations share the same software computer program, though KTCI does not have access to all of KTUSA's data on the program.  Although KTCI claims it sells tires to KTUSA, Heavy alleges there are no sales documents for the tires or warranties such as one would typically see between corporations dealing with each other on an arm's length basis.

KTCI, for its part, claims there is no overlapping between KTCI and KTUSA's directors or officers.  KTCI claims it does not direct or control the business, property, or day-to-day operations of KTUSA.  KTCI claims it does not provide financing for KTUSA nor guaranty liabilities or loans of KTUSA.  It does not pay the salaries of KTUSA's employees, officers or directors.  KTCI states that all corporate formalities of the two companies have been observed and that KTUSA is adequately capitalized.  KTCI does not collect revenue from

---

[3] Among other things, KTUSA maintains a regional sales force responsible for tire sales in South Dakota and actually sells tires here.  KTUSA also advertises in this region, including South Dakota.

KTUSA's customers or pay KTUSA's liabilities.  KTCI states the two companies have separate computer servers and accounting systems.  KTCI states it does not direct KTUSA's marketing or advertising.  Each company operates its own separate website.

KTCI designed the accident tire for use in several countries including the United States.  KTCI issues annual reports that speak about its subsidiaries, including KTUSA, as though they were mere arms of KTCI.  KTCI's president has negotiated at least one sports sponsorship in the United States, but that agreement is not connected in any way with South Dakota.  Kumho Tires has attempted aggressively to obtain sports-related advertising or sponsorship with United States athletic organizations.  A Kumho advertisement appears on the basketball hoop of a Sioux Falls basketball team.  It is unknown whether KTUSA or KTCI negotiated the contract which resulted in the placement of the ad.

## DISCUSSION

### A.    Standard Applicable to Rule 12(b)(6) Motions

KTCI's motion to dismiss is based in part on FED. R. CIV. P. 12(b)(6), which allows dismissal if the plaintiff has failed to state a claim upon which relief can be granted.  Plaintiffs must plead "enough facts to state a claim to relief that is *plausible* on its face."  Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)(emphasis added).

Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff must plead only "a short and plain statement of the claim showing that the pleader is entitled to

relief." Id. at 554-55 (quoting FED. R. CIV. P. 8(a)(2)).  A complaint does not need "detailed factual allegations" to survive a motion to dismiss, but a plaintiff must provide the grounds for his entitlement to relief and cannot merely recite the elements of his cause of action.  Id. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  There is also a "plausibility standard" which "requires a complaint with enough factual matter (taken as true)" to support the conclusion that the plaintiff has a valid claim.  Id. at 556.  The plaintiff's complaint must contain sufficiently specific factual allegations in order to cross the line between "possibility" and "plausibility" of entitlement to relief.  Id.

There are two "working principles" that apply to Rule 12(b)(6) motions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  First, courts are not required to accept as true legal conclusions "couched as factual allegation[s]" contained in a complaint.  Id. (citing Papasan, 478 U.S. at 286).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (quoting Twombly, 550 U.S. at 555).  Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Iqbal, 556 U.S. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679 (quoting decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)).  Where the plaintiff's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the complaint has

*alleged*–but has not "show[n]"–that he is entitled to relief as required by Rule 8(a)(2). Iqbal, 556 U.S. at 679 (emphasis added).

The Court explained that a reviewing court should begin by identifying statements in the complaint that are conclusory and therefore not entitled to the presumption of truth. Id. at 679-680. Legal conclusions must be supported by factual allegations demonstrating the grounds for a plaintiff's entitlement to relief. Id. at 679; Twombly, 550 U.S. at 555; FED. R. CIV. P. 8(a)(2). A court should assume the truth only of "well-pleaded factual allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. These are the principles guiding the court's evaluation of KTCI's motion.

## B.    Statute of Limitations

### 1.    South Dakota Law Applies to Determine Commencement

KTCI argues that Heavy's state law claims against it are barred by the statute of limitations. Heavy asserts a three-year limitations period applies to these claims. See SDCL § 15-2-12.2.

The statute relied upon by defendants provides in pertinent part:

> An action against a manufacturer, lessor, or seller of a product, regardless of the substantive legal theory upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, inspection, preparation, assembly, testing, packaging labeling, or sale of any product or failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product may be commenced only within three years of the date when the personal injury, death, or property damage occurred, became known or should have become known to the injured party.

8

<u>See</u> SDCL § 15-2-12.2.

In diversity actions pending in federal court, the general rule is that federal rules of procedure apply, but state substantive rules apply.  <u>Hanna v. Plumer</u>, 380 U.S. 460 (1965).  However, where application of a federal procedural rule would serve to affect a party's substantive rights, the state procedural rule must be applied.  <u>Walker v. Armco</u>, 446 U.S. 740, 752-53 (1980).  Under these principles, the South Dakota rules for commencing a court action must apply rather than federal rules.

Under Fed. R. Civ. P. 3, an action is commenced by filing the complaint. If an action is filed before the statute of limitations runs, then the action is timely.

Not so under South Dakota law.  Under South Dakota law, a suit is commenced by actual service upon the defendant.  SDCL § 15-2-30.  One can obtain a 60-day extension of the statute of limitations by placing the summons and complaint in the hands of a sheriff or other officer of the county within the limitations period.  SDCL § 15-2-31.  In such a case, the action is still deemed timely if the sheriff or county officer serves the summons and complaint within 60 days after the same have been placed in their hands.  <u>Id.</u>  Service of process against a foreign company is to be made by internationally agreed means such as is authorized by the Hague Convention.  <u>See</u> SDCL § 15-6-4(d)(9).  South Korea submits to service of its citizens through the Hague Convention.  <u>See</u> https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-

Information/KoreaRepublicof.html (all internet cites last checked on May 8, 2020).

Here, because Heavy filed its complaint mere days before the running of the statute of limitations, the court finds the application of Rule 3 would affect the substantive rights of the parties. Had Heavy filed in state court, it would have been required to actually serve KTCI with the summons and complaint before the running of the limitations period, or place the summons and complaint in the hands of the sheriff or county officer within the limitations period and then ensure the summons was served on KTCI within 60 days thereafter. SDCL §§ 15-2-30 & 15-2-31.

Numerous cases have held that, under the fact pattern presented here, the state rule for commencement of a cause of action applies rather than FED. R. CIV. P. 3 where the running of the statute of limitations is affected. See Walker, 446 U.S. at 752-53; Brossart v. Janke, 859 F.3d 616, 628 (8th Cir. 2017); Larsen v. Mayo Medical Ctr., 218 F.3d 863, 867-68 (8th Cir. 2000); Fischer v. Iowa Mold Tooling Co., Inc., 690 F.2d 155, 156-58 (8th Cir. 1982). Walker was a products liability lawsuit alleging a nail was defectively designed and manufactured. Walker, 446 U.S. at 741. Plaintiff, an Oklahoma resident, filed suit in federal district court under the court's diversity jurisdiction three days before the statute of limitations was set to expire. Id. at 741-42. Defendant was served four and a half months later. Id. at 742. Oklahoma law, like South Dakota's law here, required actual service of the summons on the

10

defendant in order to commence an action and toll the running of the statute of limitations.  Id.

Alternatively, under Oklahoma law, if the plaintiff filed the lawsuit before the running of the limitations period and then effectuated service of the summons within 60 days thereafter the action would be deemed timely. Id. at 743.  The district court and the Tenth Circuit both held plaintiff's suit to be time-barred.  Id. at 743-44.  The Supreme Court affirmed.  Id. at 753.

The Court held that, in diversity actions, "Rule 3 governs [only] the date from which various timing requirements of the Federal Rules begin to run, but does not affect state statutes of limitation" or their tolling.  Id. at 750-51.  The Oklahoma statute, the Court held, was a "statement of a substantive decision by that State that actual service on, and accordingly actual notice by, the defendant is an integral part of the several policies served by the statute of limitations."  Id. at 751.  The state statute established "a deadline after which the defendant may legitimately have peace of mind; it also recognizes that after a certain period of time it is unfair to require the defendant to attempt to piece together his defense to an old claim."  Id.  The Court held the Oklahoma statute promoted both of these substantive values.  Id.  "Rule 3 does not replace such policy determinations found in state law.  Rule 3 and [the Oklahoma statute] can exist side by side, therefore, each controlling its own intended sphere of coverage without conflict."  Id. at 752.

The Eighth Circuit reached the same conclusion in the Fischer case involving the South Dakota statutes concerning commencement of an action

and tolling of the statute of limitation. Fischer was a products liability action alleging a crane was defectively designed and manufactured. Fischer, 690 F.2d at 156. The action was filed in federal district court for the District of South Dakota three days before the statute of limitations was set to expire. Id. The plaintiff mailed the summons to the sheriff in defendant's home county in Iowa; the sheriff received the summons eight days *after* the limitations period had expired and served the defendant nine days later. Id. The defendant moved to dismiss on statute of limitations grounds because the plaintiff had not placed the summons in the hands of the sheriff before the limitations period had expired. Id.

The plaintiff attempted to distinguish the Supreme Court's decision in Walker by arguing that, although the Oklahoma statute at issue in that case was deemed to be "integral" to the state's policies, the South Dakota statute at issue in his case was *not* "integral" to South Dakota's substantive policies. Id. at 157. The Eighth Circuit rejected that argument, calling the attempted distinction "of no real moment." Id. The court concluded plaintiff's action was barred by the state rules requiring actual service on a defendant in order to commence an action, stating, "Walker v. Armco Steel has laid to rest the notion that Rule 3 can ever be used to toll a state statute of limitations in a diversity case arising under state law." Id. at 157-58.

The rule established in Walker and Fischer continue to govern. In Brossart, 859 F.3d at 619-20, plaintiffs who brought federal claims under 42 U.S.C. § 1983 also asserted state law claims against defendants, which the

12

district court dismissed as untimely.  North Dakota law, like South Dakota's, required actual service on a defendant in order to commence an action.  Id. at 628.  Plaintiffs filed their complaint in federal court before the running of the limitations period, but served defendants after the limitations period expired.  Id.  Attempting to distinguish Walker, plaintiffs argued Rule 3 should control, not North Dakota state statutes, because their complaint included state and federal claims.  Id.  The Eighth Circuit rejected this argument and affirmed the dismissal of plaintiffs' state law claims as untimely.  Id.  See also Larsen, 218 F.3d at 865-68 (holding Minnesota actual-service law applied, not Rule 3, where federal complaint was filed within the limitations period, a request to waive service was received by defendant within limitations period which defendant declined, and actual service was effectuated outside the limitations period).

Based on Walker, this court holds that South Dakota's actual-service rule is integral to substantive state policies.  Fischer, 690 F.2d at 157.  The South Dakota Supreme Court reaffirmed the Fischer court's view of the integral nature of South Dakota's actual-service rule, stating that it "is no mere technicality:  that parties be notified of proceedings against them affecting their legal interests is a 'vital corollary' to due process and the right to be heard.  Service of process advises a party that 'a legal proceeding has been commenced' and warns 'those affected to appear and respond to the claim.' " Rush v. Rush, 866 N.W.2d 556, 560 (S.D. 2015).

13

The undisputed facts show that, although Heavy filed its complaint in federal court before the expiration of the three-year statute of limitations, it did not effectuate service on KTCI until approximately 7 months outside the limitations period.  Accordingly, the conclusion seems inescapable that Heavy's state law claims against KTCI are not timely.  Heavy, in its response to KTCI's motion and this court's invitation for supplemental briefing, raises three arguments to attempt to defeat dismissal:  (1) the defendants are united in interest such that service on one effectuates service on both for statute of limitations purposes, (2) the amended complaint relates back to the original complaint, (3) the running of the statute of limitations should be tolled by SDCL § 15-2-25.

### 2.    United in Interest

The South Dakota statute for commencing a lawsuit provides in pertinent part, "[a]n action is commenced as to each defendant when the summons is served on him, or on a codefendant who is . . . otherwise *united in interest* with him."  See SDCL § 15-2-30 (emphasis added).  Heavy asserts that service upon KTUSA is effectively also service upon KTCI because the two are "united in interest."  In this vein, Heavy argues that KTCI had actual notice of the lawsuit, so it could not have been prejudiced by the delay in service.

KTCI asserts Heavy's argument is precluded by the Eighth Circuit's decision in Thach v. Tiger Corp, 609 F.3d 955 (8th Cir 2010), an unsuccessful appeal of a District of South Dakota decision dismissing the plaintiffs' claims against a Japanese defendant on statute of limitations grounds.  In Thach,

14

plaintiffs were injured when a rice cooker manufactured by a Japanese corporation, Tiger Corporation ("Tiger"), caused a fire and injured and killed several plaintiffs at their home.  Id. at 955-56.  Plaintiffs brought suit alleging negligence, strict liability and breach of warranty against Tiger and its domestic subsidiaries, Tiger USA and Tiger America.  Id.  The fire occurred December 11, 2004, and plaintiffs filed their complaint in federal district court on November 6, 2007.  Id. at 956.

Plaintiffs served Tiger USA and Tiger America within the three-year limitations period.  Id.  Plaintiffs hired a private process server to serve Tiger in Japan pursuant to the Hague Convention.  Id.  Japan's Ministry of Foreign Affairs received the summons and complaint on December 7, 2007, and served Tiger on January 24, 2008, outside the limitations period.  Id.  Tiger moved for judgment on the pleadings, arguing plaintiffs' claims were time-barred because Tiger was not served with process until the limitations period had expired.  Id.

Plaintiffs argued they had substantially complied with the service of process rule such that service on Tiger should be deemed timely because they had placed the summons and complaint in the hands of the process server within the limitations period.  Id. at 957.  Plaintiffs argued they were required to effectuate service through the Hague Convention and, once they placed the summons and complaint into the hands of the process server (or, alternatively the Japanese Ministry), plaintiffs were powerless to force the agents to serve Tiger within the limitations period.  Id.

15

The Eighth Circuit rejected this argument.  Id.  The court noted SDCL § 15-2-31 uses the very specific language "the sheriff or other officer of the county."  Id. at 958.  This language meant what it said and the court declined to interpret the language to include private process servers or the Japanese Ministry.  Id. at 959.  The court noted that, in SDCL § 15-6-4(d)(9), the provision addressing international service, the South Dakota legislature could have indicated that SDCL § 15-2-31 applied in that context too; the legislature did not so indicate.  Id.  The court held it was constrained by the plain language of § 15-2-31 and the absence of any liberal construction of that statute by the South Dakota Supreme Court.  Id.

The Eighth Circuit noted that it had previously rejected a theory of substantial compliance with § 15-2-31, and subsequent decisions of the South Dakota Supreme Court affirmed its interpretation.  Id.  The court concluded actual service of process was not effectuated on Tiger until January 24, 2008, outside the limitations period.  Id. at 960.

While the appellate opinion in Thach did not discuss the "united in interest" issue, the plaintiffs did raise that argument in substance before the district court.  See Thach v. Tiger, 4:07-cv-04165, Docket No. 59.  Plaintiffs argued that service on Tiger's wholly owned domestic subsidiary, Tiger USA, was effective as service on Tiger.  Id. at pp. 2-6.  Plaintiffs pointed out that Tiger, on its web site, referred to Tiger USA as its "representative office in the USA," much like KTCI's annual report refers to KTUSA as its distribution arm in the United States.  Id.  Plaintiffs argued that service upon Tiger occurred

16

when Tiger USA was served and that they only served Tiger subsequently through the Hague Convention so that any judgment they obtained would be enforceable in Japan.  Id.

The district court rejected this "substitute service of process" argument. Id. at Docket No. 90.  The court noted plaintiffs' argument flew in the face of the requirements South Dakota law, which required service within the limitations period of the foreign corporation.  Id. at pp. 2-6.  Substitute service on Tiger USA was not effective as service upon Tiger, even if such service "was reasonably calculated to or did in fact apprise Tiger Corporation of the pendency of the action."  Id. at p. 6.

Although the district court in Thach did not discuss the "united in interest" language from SDCL 15-2-30, it dispensed with what was, in essence, the same argument:  the foreign corporation and its wholly owned domestic subsidiary were so related that service upon one was service upon both.  This argues in favor of rejecting Heavy's argument here.

Heavy cites two 99-year-old cases in support of its argument:  Eno v. Knox, 184 N.W. 206 (S.D. 1921), and McHarg v. Commonwealth Finance Corp., 182 N.W. 705 (S.D. 1921).  Neither are dispositive.  The McHarg case was limited to the question whether the trial court had erred in refusing a corporation's motion to change the venue of the action from Beadle County Circuit Court to Hughes County Circuit Court.  Id. at 706-07.  The court never mentioned or interpreted service of process necessary to commence an action and, thereby, toll the running of the statute of limitations.  Id.

17

In Eno, the issue was whether the plaintiff in the action should have named his contractual partner as a co-plaintiff. Eno, 184 N.W. at 207. Again, the court did not discuss service of process or the statute of limitations. Id. The court merely concluded that because the plaintiff and his partner were part of a joint contract to be performed jointly, the plaintiff should have named his partner in the lawsuit. Id.

The only law the court has been able to find applying this "united in interest" language from the South Dakota service of process statute cuts against Heavy's assertion. In Spiska Engineering, Inc. v. SPM Thermo-Shield, Inc., 798 N.W.2d 683, 684-85 (S.D. 2011), Spiska sued SPM on a breach of contract claim and obtained a judgment against SPM. SPM was wholly owned by an individual named Joseph Raver, who was SPM's sole shareholder, president and CEO. Raver was not a party to the contract action. Id. at 685. A receiver was appointed to liquidate SPM's assets to satisfy the judgment and, when Raver was served with notice of the sale, he filed an objection. Id. The circuit court overruled the objection and Raver appealed, arguing that the court never had jurisdiction over him. Id. The Supreme Court of South Dakota agreed. The court held the circuit court did not acquire personal jurisdiction over Raver simply by serving SPM with service of process. Id. at 690.

Although Spiska is not completely on point here, the issue being whether service on a defendant who is "united in interest" with an unnamed party can be subject to the court's personal jurisdiction when he makes a voluntary

18

appearance before the court, nonetheless, it is instructive. A corporation wholly owned by a sole individual who also occupies all officer positions within the corporation can hardly be said to have lacked notice of the proceedings against the corporation. Yet Heavy argues KTCI should be deemed to have been timely served because it had notice of the proceedings.

In <u>re Briggs</u>, 898 N.W.2d 465, 467-68 (S.D. 2017), a deceased mother had created a trust under which her son, Thomas, was disinherited, and her daughter, Judith, was the sole beneficiary and also trustee of the trust. Thomas was given notice of his mother's death, the existence of the trust and he was advised of the 60-day limitations period for contesting the trust. <u>Id.</u> Approximately two years later, he brought suit to contest the trust alleging his mother had lacked capacity and asserting Judith unduly influenced his mom. <u>Id.</u> at 468. Trying to get around the 60-day limitations period, Thomas argued his claim against Judith for breach of fiduciary duty should be subject to a three-year statute of limitations. <u>Id.</u> at 471. The court rejected this argument, noting he sued his sister on the theory that, in her role *as caretaker* of their mother, Judith had unduly influenced the mom. <u>Id.</u> The court rejected this argument because Thomas had sued Judith only in her capacity as the trustee, not in her individual capacity. <u>Id.</u> Thus, in <u>Briggs</u>, the court refused to extend the statute of limitations for the same person—Judith—in her different capacities.

On the basis of the district court's opinion in <u>Thach</u>, and the analogous holdings of the court in <u>Briggs</u> and <u>Spiska</u>, the court concludes Heavy's "united in interest" argument must be rejected.

### 3.    Relation Back of the Amended Complaint

Heavy makes the second argument that, under FED. R. CIV. P. 15(c) the amendment should relate back to the original complaint.  In this regard, Heavy asserts KTCI had "actual notice" of the complaint.  Again, though, Heavy provides the court with no citation to any support for this assertion.  In addition, Heavy argues that KTCI knew or should have known that but for a mistake about the proper identity of the party, the party would have been named.  But this argument flies in the face of the facts:  KTCI *was* named as a defendant in the original complaint, it just was never apparently served with the original summons and complaint.  Rule 15(c) applies when a defendant is *not named* in the original complaint and later *is* named in an amendment.  In fact, although Heavy says it was "mistaken" about which entity actually manufactured and designed the accident tire, the statement about KTCI's role for purposes of this lawsuit is identical in both the original complaint and the amended complaint.  <u>See</u> 5:19-cv-5044 at Docket No. 1, ¶ 4, and Docket No. 12, ¶ 4.  In other words, if the first complaint was "mistaken," the amended complaint is too as it asserts the same role in the events as to KTCI.

The court is unconvinced that a party's naming of a defendant and failing to serve that defendant—when service is required in order to toll the

statute of limitations—can be excused by later amending the complaint and then (untimely) serving that amended complaint.

The only law Heavy cites in support of its Rule 15(c) argument is the rule itself and Osorio v. Minneapolis Hotel Acquisition Group, LLC, 335 F. Supp. 3d 1141 (D. Minn. 2018). In Osorio, a plaintiff sued the hotel he had previously been employed at and had been fired from. Id. at 1142-43. In between the time the plaintiff was fired and the time he sued, the hotel had changed hands, so he sued the successor owner. Id. But, it turned out that the previous owner, plaintiff's actual employer, had retained all liabilities. Id. So plaintiff amended his complaint two days after the statute of limitations had run and named his former employer as the defendant. Id. He argued the amendment related back because, but for a mistake, he would have named the right defendant and the court agreed. Id. at 1144-46.

Here, Heavy *did* name KTCI in its original complaint, it just failed to serve KTCI with the summons and the original complaint. That is a significant difference from Osorio—here, there was no mistaken omission of the defendant from the original complaint. There was simply an omission of another defendant, Kumho Vietnam. Also, while in Osorio the proper defendant was served within two days of the running of the statute of limitations, here KTCI was not apparently served until January 29, 2020. It is easy for a court to presume there is no prejudice where the missing of the statute of limitations is a matter of two days. It is less easy to make such a presumption where the

21

lapse is seven months.  The court declines to apply Rule 15(c) to cure the

failure of Heavy to timely serve KTCI.

### 4.    Tolling Under SDCL § 15-2-25.

Heavy's final argument is that the court should toll the running of the

statute of limitations against KTCI under SDCL § 15-2-25, which provides as

follows:

> When the commencement of an action is stayed by injunction or
> statutory prohibition, the time of the continuance of the injunction
> or prohibition is not part of the time limited for the commencement
> of the action.

See SDCL § 15-2-25.  Clearly, Heavy's case does not fit within the plain

language of the statute:  here, no injunction or statutory prohibition interfered

with or made it impossible for Heavy to serve KTCI.  Heavy merely did not leave

itself enough time to get KTCI served within the limitations period.

Heavy relies on Loesch v. City of Huron, 723 N.W.2d 694 (S.D. 2006).

But that case is inapposite because it *did* involve a statutory prohibition on

filing suit.  Loesch was injured when the city failed to mark an area of the

street where it was making repairs and Loesch rode his bicycle into it, injuring

himself.  Id. at 695.  South Dakota statutes required Loesch to (1) give notice to

the city of his injury within 180 days of his injury and (2) prohibited him from

filing any personal injury action until the expiration of 90 days, during which

the city could respond to his claim.  Id.  The court held these statutes, in effect,

prohibited Loesch from filing suit for 90 days after he gave his notice to the city

and, therefore, SDCL § 15-2 25 tolled the running of the statute of limitations

22

during that 90-day period.  Id. at 696.  Here, there simply is no statutory prohibition or injunction that prevented Heavy from filing suit against KTCI.

The Eighth Circuit in Thach did not specifically address the applicability of SDCL § 15-2-25, holding that plaintiffs had waived this issue by not raising it before the district court.  Thach, 609 F.3d at 958.  The court did address, however, the argument that the statute of limitations should be equitably tolled.  Id. at 960.

The court rejected equitable tolling because it concluded the plaintiffs were insufficiently diligent to be able to invoke equitable tolling.  Id.  The court noted plaintiffs first attempted to serve Tiger with less than a month before the statute of limitations expired, placing the summons and complaint in the hands of the private process server at this time.  Id.  The process server did not deliver the summons to the Japanese Ministry until only four days were left in the limitations period.  Id.  The court held it was not reasonable for plaintiffs to expect the Ministry to effectuate service on Tiger within four days of receipt of the summons.  Id.  The court further held the fact that Tiger had received timely notice of the lawsuit through its domestic subsidiary, Tiger USA, would not serve to invoke equitable tolling either.  Id. (citing Peterson v. Hohm, 607 N.W.2d 8, 13-14 (S.D. 2000) (holding limitations period would not be equitably tolled even though defendants received timely notice through filing of federal court action that was dismissed for lack of diversity)).

The case of Dillon v. Board of Pension Comrs. of City of Los Angeles, 116 P.2d 37, 38-40 (Cal. 1941), similarly involved a statute which required a widow,

23

before filing a lawsuit in court, to present her claim to a board of pensions and she was required to wait for the board to make a decision before suing.  The court held this period during which the board was deliberating—like the 90 days during which the city of Huron was deliberating in <u>Loesch</u>—should not be counted toward the statute of limitations.  <u>Id.</u>  Thus, both <u>Loesch</u> and <u>Dillon</u> are completely distinguishable from the facts presented in this case.

The court concludes Heavy was required to actually serve KTCI within the statute of limitations and it failed to do so.  Furthermore, like the plaintiffs in <u>Thach</u>, the court finds they did not act with due diligence.  They filed suit with only five days remaining in the limitations period, placing the summons in the hands of the process server within those five days, but not even getting the summons into the Japanese Ministry's possession until well after the limitations period had already expired.  Knowing that service would have to be made on KTCI through the Hague Convention, Heavy simply did not act with due diligence to make sure that service could be timely made.  The court recommends dismissal of all Heavy's state law claims against KTCI on the grounds that they are time-barred.  Such dismissal should be with prejudice.

## C.    Magnuson-Moss Warranty Act Claim

In Counts V and VI Heavy asserts "defendants" without distinguishing among them breached the implied warranty of merchantability and the implied warranty of fitness in violation of § 2310(d)(1) of the Magnuson-Moss Warranty Act.  <u>See</u> Docket No. 12 in 5:19-cv-5044.  Neither party mentions what statute of limitations is applicable to Heavy's Magnuson-Moss claims.  All the statute

24

of limitations arguments made by both parties were limited to discussing Heavy's state law claims and the state statute of limitations governing those claims. Because KTCI has not argued that the Magnuson-Moss claims are time-barred, the court considers the arguments KTCI *has* made in favor of dismissing those claims.

The Magnuson-Moss Act grants the holder of a warranty a federal cause of action for breach of warranty under the applicable state law. Sipe v. Workhorse Custom Chassis, LLC, 572 F.3d 525, 530 (8th Cir. 2009). The Act provides additional remedies when consumers purchase consumer products that do not measure up to the implied and explicit warranties for those products. See 15 U.S.C. § 2310. The Act defines "consumer product" as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." See 15 U.S.C. § 2301(1). A "consumer" is defined by the Act as "a buyer. . . of any consumer product . . ." Id. at (3).

The Federal Trade Commission has promulgated regulations implementing the Magnuson-Moss Act. Those regulations provide that if a product is "normally" used for personal, family, or household purposes, it is a "consumer product" regardless of the *actual* use put to it by the actual buyer. See 16 C.F.R. § 700.1(a). Any ambiguity about whether a particular product is covered by the Act is resolved in favor of coverage. Id.

KTCI argues Heavy can only maintain its Magnuson-Moss Act claim in federal court if its damages are at least $50,000. It argues Heavy's damages

25

are less than $50,000.  Heavy maintains its damages meet the amount in controversy requirement under the Act.  Because KTCI's motion calls into question the court's subject matter jurisdiction over Heavy's Magnuson-Moss claims, it is governed by FED. R. CIV. P. 12(b)(1).

A plaintiff who invokes federal jurisdiction under the Magnuson-Moss Act must show a "reasonable probability" that the $50,000 amount in controversy is met.  Pyskaty v. Wide World of Cars LLC, 856 F.3d 216, 223 (2d Cir. 2017).  A rebuttable presumption arises if a complaint represents the amount in controversy.  Id.  A defendant may rebut the presumption by showing "to a legal certainty" the plaintiff cannot recover the amount of damages alleged.  St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938); Knopick v. Jayco, 895 F.3d 525, 529 (7th Cir. 2018) (stating an amount in controversy alleged in a complaint "satisfies the jurisdictional requirement so long as it is not legally impossible for the claimant to recover that amount in damages on the claim.").  Events which happen after the commencement of the suit which reduce the amount recoverable to less than the required amount in controversy do not oust the court of jurisdiction. St. Paul Mercury Indem. Co, 303 U.S. at 288-89.

It is the party invoking federal court jurisdiction that must prove the jurisdictional amount in controversy by a preponderance of the evidence.  Id.  If the party invoking federal jurisdiction did not plead an amount in controversy, or the pleading is inconclusive, the court may look to other evidence in the record.  Dupraz v. Aventis CropScience USA Holding, Inc., 153 F. Supp. 2d

1102, 1104 (D.S.D. 2001).  When a court considers evidence outside the pleadings, that does not convert a Rule 12(b)(1) motion into a motion for summary judgment.  <u>Deuser v. Vecera</u>, 139 F.3d 1190, 1191 n.3 (8th Cir. 1998).  A dismissal for failure to meet the amount in controversy requirement— which requirement applies only to federal court actions under Magnuson-Moss—should be without prejudice to the plaintiff's ability to refile in state court where the Act imposes no amount in controversy requirement.  <u>Torres-Fuentes v. Motorambar Inc.</u>, 396 F.3d 474, 475-76 (1st Cir. 2005); <u>Ansari  v. Bella Auto Grp. Inc.</u>, 145 F.3d 1270, 1272-73 (11th Cir. 1998); <u>Barnette v. Chrysler Corp.</u>, 434 F. Supp. 1167, 1168 (D. Neb. 1977).

Section 2310 of the Magnuson-Moss Act provides in pertinent part:

**(d) Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims**

(1) Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—

(A) in any court of competent jurisdiction in any State . . .

(B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection.

* * *

(3) No claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection—

* * *

(B) if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit;

27

See 15 U.S.C. § 2310(d)(1)(B) and (3)(B).

The Act provides a plaintiff can maintain a Magnuson-Moss claim in state *or* federal court, but the $50,000 amount in controversy requirement limits those actions which can be brought in federal court.  Id.  Claims for less than that amount may still be brought in state court under Magnuson-Moss. Id.  That distinction becomes important to KTCI's motion to dismiss, as explained further below.

Heavy has stated generally in its complaint that its damages are in excess of $75,000.  See Docket No. 12 at p.4, ¶ 16, in 5:19-cv-5044.  However, once the amount in controversy is challenged, this mere general allegation is not enough to carry Heavy's burden.  Gibbs v. Buck, 307 U.S. 66, 72 (1939). Instead, in response to KTCI's motion, Heavy has the burden to demonstrate by a preponderance of the evidence that its Magnuson-Moss claims exceed $50,000.  Scottsdale Ins. Co. v. Universal Crop Protection Alliance, LLC, 620 F.3d 926, 931 (8th Cir. 2010); Drobnak v. Andersen Corp., 561 F.3d 778, 786 (8th Cir. 2009).

The parties' dispute centers on what categories of damages a plaintiff may claim under the Act.  KTCI argues Heavy cannot claim anything except its economic damages, which amount to $8,322.68 for property damage.  Heavy asserts the following damages are recoverable under Magnuson-Moss and therefore count toward the amount in controversy requirement:

| | |
|---|---|
| Property Damage | $   8,322.68 |
| Funeral & Burial Expense | $  10,000.00 |

| | |
|---|---|
| Undifferentiated Damages<br>This includes:  Medical Bills, Lost<br>Wages, Towing Expenses, Inspection<br>Expenses, Investigation Expenses,<br>Attorney's Fees, Appraisal Expenses,<br>and Storage Expenses | $1,156,995.00 |

In general, state law determines what damages are available for a claim of breach of warranty under the Magnuson-Moss Act.  Pyskaty, 856 F.3d at 223; Torres-Fuentes, 396 F.3d at 475; Schimmer v. Jaguar Cars, Inc., 384 F.3d 402, 405 (7th Cir. 2004); Boyd v. Homes of Legend, Inc., 188 F.3d 1294, 1298 (11th Cir. 1999).  Punitive damages may be counted toward the jurisdictional amount only if they would be recoverable in a state law breach of warranty action.  Pyskaty, 856 F.3d at 224-25; Kelly v. Fleetwood Ent. Inc., 377 F.3d 1034, 1039-40 (9th Cir. 2004); Boelens v. Redman Homes, Inc., 748 F.2d 1058, 1069 (5th Cir. 1984); Hughes v. Segal Ent., Inc., 627 F. Supp. 1231, 1238-39 (W.D. Ark. 1986).  See also Romo v. FFG Ins. Co., 397 F. Supp. 2d 1237, 1240-41 (C.D. Ca. 2005) (counting treble damages, a civil penalty applicable under state law, toward the amount in controversy).

KTCI cites Boelens 748 F.3d at 1065-66, and Romo, 397 F. Supp. 2d at 1240 for the proposition that subrogation claimants cannot claim punitive damages.  Neither Boelens nor Romo stand for that proposition.  However, there is a different obstacle to Heavy's argument that punitive damages should be counted:  they have not pleaded any facts in support of such a claim in connection with their Magnuson-Moss claims.  Although Heavy generally requests punitive or exemplary damages in the final paragraph of its amended complaint setting forth its prayer for relief (see Docket No. 12 in 5:19-cv-5044

at p. 12), they do not allege that KTCI acted with malice, express or implied, nor do they assert any facts from which the court could infer malice in connection with the Magnuson-Moss Act claims.  See id. Claims V and VI.

A necessary element which the plaintiff must prove in order to submit a request for punitive damages to the jury is that the defendant acted with malice, either actual or presumed.  See Holmes v. Wegman Oil Co., 492 N.W.2d 107, 112-113 (S.D. 1992); SDCL § 21-3-2.

Actual malice is defined as "a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person."  Harter v. Plains Ins. Co., 579 N.W.2d 625, 634 (S.D. 1998).  Presumed malice is shown when a person acts willfully or wantonly to the injury of others.  Case v. Murdock, 488 N.W.2d 885, 891 (S.D. 1992). Presumed malice "implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations," Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991), or evidenced by a "reckless disregard for one's rights."  Flockhart v. Wyant, 467 N.W.2d 473, 478 (S.D. 1991).  One purpose of punitive damages is to deter the defendant from repeating the wrongful conduct and to deter others from engaging in the same conduct.  Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493, 504 (S.D. 1997).

Heavy's amended complaint contains no assertion of actual or presumed malice on the part of KTCI.  Therefore, the court does not consider punitive damages in calculating Heavy's damages under the Act.

Although a successful plaintiff may be entitled to an award of attorney's fees and costs under Magnuson-Moss, attorney's fees may not be considered in determining whether plaintiff meets the amount in controversy.  15 U.S.C. § 2310(d)(3)(B);  Samuel-Bassett v. KIA Motors America, Inc., 357 F.3d 392, 402 (3d Cir. 2004); Mishra v. Coleman Motors, LLC, 2017 WL 994868 at *3 (E.D. Mo. Mar. 15, 2017).  Heavy argues, without citing any case authority in support, that attorneys fees are "expenses" under the Act (see 15 U.S.C. § 2310(d)(2)(ii)), so when the Act states the amount of damages must be $50,000 or more exclusive of "costs," the term "costs" does not include attorneys fees.  No court that this court is aware of has interpreted the Act in this fashion and the court declines Heavy's invitation to adopt such an anomalous interpretation.  Therefore, Heavy's attorney's fees (which are not stated with specificity in any event) are not considered in calculating the amount in controversy under the Act.

Only the value of all the claims asserted under the Magnuson-Moss Act may be considered in evaluating whether the amount in controversy requirement is met:  the value of other non-Act claims pleaded in the complaint may not be aggregated with the damages of Magnuson-Moss claims.  Loy v. BMW of North America, LLC, 2019 WL 6250844 *6 (E.D. Mo. Nov. 2019) (citing Abraham v. Volkswagen of America, Inc, 795 F.2d 238, 242-43 (2d Cir. 1986); Schroeder v. Barth, Inc., 969 F.2d 421, 422 (7th Cir. 1992); and Saval v. BL Ltd., 710 F.2d 1027, 1030 (4th Cir. 1983)); Mishra, 2017 WL 994868 at *2 (citing, inter alia, Scarlott v. Nissan N. Amer. Inc., 771 F.3d 883, 887-88 (5th

Cir. 2014); and <u>Ansari</u>, 145 F.3d at 1272; <u>Abedrabbo v. Topps Meat Co, LLC</u>, 756 F. Supp. 2d 18, 23 (D.D.C. 2010).  Thus, the individual claims asserted by Heavy and American Zurich under Magnuson-Moss in counts V and VI of the amended complaint can be aggregated together to arrive at the $50,000 amount in controversy requirement, but the state law claims asserted by either plaintiff in Counts I through IV of the amended complaint cannot be counted toward that amount.

The real bone of contention between the parties is whether Heavy may count personal injury damages to meet the amount in controversy requirement for a federal court claim under the Magnuson-Moss Act.  Heavy argues that state law allows personal injury damages for breach of an implied warranty. <u>See</u> SDCL § 57A-2-715(2)(b).  KTCI argues, however, that although Heavy may be entitled to those damages on a state law breach of implied warranty claim, Heavy is ***not*** entitled to such damages under Magnuson-Moss and, therefore, such damages cannot be counted toward the Act's amount in controversy requirement.

Key to KTCI's argument is the Fifth Circuit's decision in <u>Boelens v. Redman Homes, Inc.</u>, 748 F.2d 1058 (5th Cir. 1984).  In that case, plaintiffs purchased a mobile home containing components made using formaldehyde resin from which the plaintiffs alleged they suffered personal injuries.  <u>Id.</u> at 1060-61.  They brought suit in federal district court under Magnuson-Moss, and alleged state law claims for strict products liability, negligence, and breach of express and implied warranties.  <u>Id.</u>  Defendants sought dismissal because

plaintiffs' economic damages were less than the jurisdictional amount in controversy of $50,000 and defendants argued Magnuson-Moss prohibited claims for personal injury or punitive damages.  Id.  The district court denied defendants' motion because state law allowed plaintiffs to obtain personal injury damages for breach of warranty.  Id. at 1061.  The Fifth Circuit reversed.

Analyzing 15 U.S.C. § 2311, the court held that Magnuson-Moss "prohibits claims arising from personal injury based solely on a breach of warranty, express or implied.  One may, however, recover personal injury damages under the MMWA where there has been a violation of the substantive provisions of § 2308 (prohibiting disclaimer of implied warranties), § 2304(a)(2) (prohibiting full warrantors from limiting the duration of implied warranty coverage) or § 2304(a)(3) (prohibiting full warrantors from excluding or limiting consequential damages unless such exclusion or limitation conspicuously appears on the face of the warranty)."  Id. at 1068.

Applying its interpretation of § 2311, the Boelens court held plaintiffs' personal injury damages would not be considered in analyzing whether they met the amount in controversy requirement because their Magnuson-Moss claim was not based on one of the three exceptions enumerated in the Act.  Id. at 1068-69.  Adding up plaintiffs' economic damages, and excluding punitive damages and attorney's fees, the court held they did not satisfy the $50,000 requirement.  Id. at 1069-71.

Section 2311, upon which the Boelen court rested its holding, provides in pertinent part as follows:

33

**Applicability to Other Laws**

* * *

**(b) Rights, remedies and liabilities**

> (1) Nothing in this chapter shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law.

> (2) Nothing in this chapter (other than sections 2308 and 2304(a)(2) and (4) [sic] [4] of this title) shall

>> (A) affect the liability of, or impose liability on, any person for personal injury or

>> (B) supersede any provision of State law regarding consequential damages for injury to the person or other injury.

See 15 U.S.C. § 2311(b).

In counts V and VI of Heavy's amended complaint, the Magnuson-Moss claims, Heavy references only § 2310(d)(1) of the Magnuson-Moss Act and invokes as a basis of liability only South Dakota's implied warranty law.  See Docket No. 12 at p. 11, ¶¶ 59, 64.  It is clear Heavy has **not** stated a claim under any one of the three exceptions set forth in § 2311(b)(2) in word or substance.

The first exception, section 2308, covers claims that a warrantor issued a written warranty that disclaimed or modified an implied warranty in a way prohibited by the Act.  See 15 U.S.C. § 2308.  Heavy alleges no such claim in

---

[4] Courts generally agree that the reference to § 2304(a)(4) was a draftsman's error and the reference should have been to § 2304(a)(3).  Kelly, 377 F.3d at 1038; Boelens, 748 F.2d at 1065 n.10; Abedrabbo, 756 F. Supp. 2d at 21-22 n.1; Gorman v. Saf-T-Mate, 513 F. Supp. 1028, 1035 (N.D. Ind. 1981).  From this point on in the opinion, the court refers to the presumed correct provision, subsection (a)(3).

its complaint.  The second and third exceptions enumerated under the Act, subsections (2) and (3) of § 2304(a), prohibit a warrantor from issuing a written warranty that limits the duration of an implied warranty on the product or that excludes or limits consequential damages for breach of implied warranty unless the exclusion is conspicuously featured on the face of the warranty.  See 15 U.S.C. § 2304(a)(2) & (3).  Counts V and VI of Heavy's complaint are premised on a warranty implied by law; § 2304(a)(2) and (3) have to do with terms of an actual, express written warranty.

All three of the exceptions to personal injury claims under § 2311(b) are claims based upon a *written warranty*.  Heavy's claims V and VI asserted in its amended complaint are not based in any way shape or form on a written warranty.  They are solely based on the implied warranty which arises as a matter of law under South Dakota state law.  Virchow v. University Homes, Inc., 699 N.W.2d 499, 505 (S.D. 2005) (implied warranties arise by operation of law and do not rest upon any supposed agreement in fact).  Therefore, if Boelen is the law in our circuit, Heavy cannot count any personal injury damages toward the $50,000 amount in controversy requirement.

The court has not discovered an Eighth Circuit decision addressing this issue.  See Loy, 2019 WL 6250844 *5 (stating the Eighth Circuit had not yet addressed how to calculate the amount in controversy under Magnuson-Moss).  District courts in our circuit have, however.  The Western District of Arkansas followed the rule set forth in Boelens in Hughes v. Segal Ent., Inc., 627 F. Supp. 1231, 1237-39 (W.D. Ark. 1986), as did the District of Nebraska in

Sanford v. Ektelon/Prince Sports Grp., Inc., 1999 WL 33537914 at *7 (D. Neb. Nov. 5, 1999) (stating plaintiff could not count personal injury damages toward the amount in controversy under Magnuson-Moss unless a claim fell within one of the three enumerated exceptions in § 2311). Our sister circuit, the Seventh, to which the Eighth Circuit often turns when faced with questions of first impression, follows the rule announced in Boelens. See Voelker v. Porsche Cars No. Amer., Inc., 353 F.3d 516, 525 (7th Cir. 2003). See also Kelly, 377 F.3d at 1038-39 (following the Boelens holding as to personal injury damages under Magnuson-Moss).

Heavy cites Wise v. General Motors Corp., 588 F. Supp. 1207 (W.D. Va. 1984), in support of its argument that personal injury damages can be counted toward the amount in controversy requirement of the Act. But Wise does not stand for the proposition. Instead, in the Wise case, the plaintiff had pleaded damages claims under both Magnuson-Moss and state law for breach of warranty. Id. at 1208. Defendant moved to dismiss *any* claim for personal injury under either the state law claims or the Magnuson-Moss Act, arguing that Magnuson-Moss prohibited an award of damages for personal injury. Id. Thus, the issue in Wise was not whether the amount in controversy requirement was met, but rather whether Magnuson-Moss prohibited recovery of personal injury damages under state law when a state law claim was paired with a Magnuson-Moss claim. Id.

The court held that § 2311 expressed a congressional intent, buttressed by the legislative history of the Act, not to eclipse any remedy available to

36

consumers via state law.  Id.  Therefore, the plaintiff was allowed to assert a claim for personal injury damages in connection with the state law claim because the same were allowed by state law.  Id.

This court could not agree more with the Wise decision.  Section 2311 is a savings clause—it is intended to ensure that no rights or remedies belonging to consumers under state law would be held to be precluded or eliminated by Magnuson-Moss.  And so it is.  Here, Heavy can maintain an action under state law for its personal injury damages for breach of implied warranty (if the same were not time-barred).  But Boelens and the many cases that have followed Boelens establish that personal injury damages may ***not*** be obtained under Magnuson-Moss—unless the plaintiff asserts a claim falling within one of the three enumerated exceptions.  Because personal injury damages are not available under the Act, they cannot be counted toward the amount in controversy required by the Act in order to maintain a federal court action.

Heavy also cites to Scarlott v. Nissan No. Amer., Inc., 771 F.3d 883, 885 (5th Cir. 2014) (*en banc*), for the proposition that state law determines the applicable scope and measure of damages under Magnuson-Moss.  See Docket No. 89 at pp. 24-25.  That is not what Scarlott stands for.  Scarlott, like Boelens, is a decision of the Fifth Circuit and Scarlott *affirmed* Boelens by citing it approvingly.  Id. at 887.  What the Scarlott court actually said was this:  "Generally, courts look to state law to determine the applicable measure of damages, which informs the amount in controversy under the MMWA.  This court, however, has recognized *several limitations* in calculating the amount in

controversy under the MMWA.  *First, personal injury damages for breach of warranty, which are not recoverable under the MMWA, may not be counted to satisfy the jurisdictional amount.*"  Id. (citations omitted, emphasis added). Thus, Scarlott supports KTCI's position, not Heavy's position.

The court concludes that the rule announced in Boelens should control in this case.  Heavy has not cited the court to any district court within this circuit that declined to follow Boelens or that announced a different rule. Furthermore, the Boelens reasoning appears sound to this court, giving meaning to the entirety of § 2311.  Accordingly, adopting Boelens, this court will not consider personal injury damages paid out by Heavy in calculating the amount in controversy under the Act.

Aside from funeral expenses and property damage, Heavy has not itemized its damages.  It has simply stated it has $1.5 million in damages, and then cited to a laundry list of things included in that sum, some of which (punitive damages, medical bills, and attorney's fees) the court has concluded *cannot* be counted toward the amount in controversy.  Some of the items on the list—storage fees and towing—are assumed by the court to be *de minimus*. Other damages such as appraisal and inspection are speculative.  When the amount in controversy is challenged and a plaintiff's response is vague and speculative, that response will not be included in the calculation of the amount in controversy.  Curry v. Pleasurecraft Marine Engine Co., 950 F. Supp. 2d 1057, 1060 (W.D. Mo. 2013).  Therefore, the court concludes Heavy has failed to establish by a preponderance of the evidence that it can meet the amount in

38

controversy requirement under the Magnuson-Moss Act.  It follows, then, because Magnuson-Moss is the only federal claim alleged, there is no federal question jurisdiction over that claim.  But that does not mean that Heavy's Magnuson-Moss claim should be dismissed.

Heavy cites <u>Wetzel v. American Motors Corp.</u>, 693 F. Supp. 246 (E.D. Pa. 1988), for the proposition that this court can exercise pendent jurisdiction over its Magnuson-Moss claim even if Heavy cannot state damages which equal or exceed $50,000.  The <u>Wetzel</u> decision was issued under the common law doctrine of pendent jurisdiction whereas that doctrine was later codified as "supplemental jurisdiction" in 1991.  <u>See</u> 28 U.S.C. § 1367.  But the results are the same in this case whether analyzed under the common law doctrine or 28 U.S.C. § 1367.

Section 1367 of Title 28, the codified version of pendent jurisdiction, provides in pertinent part as follows:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

<u>See</u> 28 U.S.C. § 1367(a).

Here, Heavy clearly has established independent jurisdiction under 28 U.S.C. § 1332 over its state law claims against KTUSA.  KTUSA has not moved for dismissal of the claims against it on the basis of lack of subject matter

39

jurisdiction.  Therefore, because the court has an independent basis for exercising jurisdiction in this case (under § 1332), under § 1367(a), the court may exercise supplemental jurisdiction over the federal Magnuson-Moss claim against KTCI because it arises out of the same case or controversy.  See Mishra, 2017 WL 994868 at **7-8; Chavis v. Fidelity Warranty Serv., Inc., 415 F. Supp. 2d 620, 623-25 (D.S.C. 2006); Barnes v. West, Inc., 249 F. Supp. 2d 737, 739 (E.D. Va. 2003).  Exercising supplemental jurisdiction over KTCI will not destroy diversity of citizenship among the parties.  See 28 U.S.C. § 1367(b).

A plaintiff may not count the damages from any pendent state law claims toward the satisfaction of the $50,000 amount in controversy requirement under the Magnuson-Moss Act—only damages flowing from the claim asserted under Magnuson-Moss can be counted.  Ansari, 145 F.3d at 1272; Boelens, 748 F.2d at 1071; Abedrabbo, 756 F. Supp. 2d at 23.  Here, however, the court is not combining Heavy's damages from its state law claims against KTUSA in order to establish the $50,000 amount in controversy required under Magnuson-Moss.  The court has already concluded Heavy has not carried its burden of establishing the amount in controversy under Magnuson-Moss.  Rather, the court recommends exercising supplemental jurisdiction over that claim.

Assuming KTCI is correct that Heavy cannot show damages under Magnuson-Moss in excess of $50,000 (even if Heavy were sufficiently specific about its damages), there is nevertheless an independent jurisdictional basis under § 1367 that allows the court to entertain that claim.  In essence, the

40

Magnuson-Moss claim where it cannot meet the amount in controversy requirement is treated as a state law claim—it would otherwise have to be brought in state court.  In this case is should be allowed in federal court under § 1367 because it is part of the same case or controversy as Heavy's other claims over which the court *does* have jurisdiction.  The court accordingly recommends denying KTCI's motion for dismissal of Heavy's Magnuson-Moss claim against it on the basis of not meeting the $50,000 amount in controversy requirement.

**D.    Personal Jurisdiction Over KTCI**

**1.    Standard for Evaluating Personal Jurisdiction Challenges**

KTCI also argues this court cannot exercise personal jurisdiction over it. This portion of KTCI's motion is governed by FED. R. CIV. P. 12(b)(2).  The Eighth Circuit recently addressed the standard for evaluating personal jurisdiction in Whaley v. Esebag, 946 F.3d 447 (8th Cir. 2020).  When personal jurisdiction is challenged, the plaintiff bears the burden of establishing a *prima facie* showing of jurisdiction with evidence viewed in the light most favorable to the plaintiff.  Id. at 451.  The plaintiff must allege facts in the complaint sufficient "to support a reasonable inference that defendant may be subjected to jurisdiction in the forum state."  Van Dusseldorp v. Continental Cas. Co., 2017 WL 4004421 at *2 (D.S.D. Sept. 11, 2017).  In diversity cases, federal courts apply the long-arm statute of the forum state to determine whether personal jurisdiction over the defendant exists.  Whaley, 946 F.3d at 451.

Here, South Dakota's long-arm statute permits personal jurisdiction to be exercised to the full extent allowed by the Due Process Clause.  SDCL § 15-7-2; Van Dusseldorp, 2017 WL 4004421 at *2.  Therefore, this court can exercise personal jurisdiction over KTCI if Heavy can show "sufficient 'minimum contacts' exist between South Dakota and [KTCI] so that 'traditional notions of fair play and substantial justice' are not offended."  Id. (quoting Internat'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  The nature of KTCI's contacts with South Dakota must be such that KTCI "could 'reasonably anticipate being haled into court' " here.  Id. (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  See also Walden v. Fiore, 571 U.S. 277, 283 (2014).

Although personal jurisdiction can be general or specific (see Viasystems, Inc. v. EMB-Papst St. Georgen GmbH Co., KG, 646 F.3d 589, 593 (8th Cir. 2011)), Heavy invokes only specific jurisdiction.  "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state."  Fastpast, Inc. v. Arbela Technologies Corp., 760 F.3d 816, 820 (8th Cir. 2014).  Assertions of specific jurisdiction require the court to evaluate whether KTCI has "purposefully directed [its] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities."  Whaley, 946 F.3d at 451 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).  Specific jurisdiction requires a showing that the defendant "purposely avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and

protections of its laws." Fastpath, Inc., 760 F.3d at 821 (quoting J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 880 (2011) (opinion of Kennedy, J., concurring)).[5]

When the basis of the lawsuit is a tort, courts evaluate specific jurisdiction under the "effects test" established by Calder v. Jones, 465 U.S. 783 (1984), and narrowed by Walden, 571 U.S. at 284. Whaley, 946 F.3d at 451. "First, the relationship must arise out of contact that the 'defendant himself' created with the forum state." Id. (quoting Burger King, 471 U.S. at 475). "Second, [courts] look to the defendant's contacts and conduct with the forum state *itself*, not the defendant's contacts with persons who reside there." Id. (emphasis in original) (quoting Walden, 571 U.S. at 285).

The Eighth Circuit applies a five-factor test to evaluate minimum contacts: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." Whaley, 946 F.3d at 452. The third factor is particularly relevant to assertions of specific jurisdiction. Id. The fourth and fifth factors are less weighty and not determinative. Id.

A defendant challenging personal jurisdiction must support its challenge with affidavits and exhibits. Fastpath, Inc., 760 F.3d at 820. When so supported, a plaintiff may not rely on the pleadings, but must present affidavits and exhibits opposing the motion. Id.

---

[5] The J. McIntyre case was a plurality opinion.

### 2.    Specific Jurisdiction

Although there are two types of personal jurisdiction courts can exercise over defendants—general and specific—Heavy relies only on specific jurisdiction.  Therefore the court does not discuss general jurisdiction principles.

In its motion to dismiss, KTCI asserts that it had *no contacts* with South Dakota at all.  The only contact it had was the accident tire that KTCI designed and Kumho Vietnam manufactured in Vietnam made its way into South Dakota.  But this cannot confer specific jurisdiction KTCI argues.  KTCI argues it did not know, intend, or project that the tire was going to end up in South Dakota.  It did not direct its activities to South Dakota.  It is not registered to do business in South Dakota, it pays no taxes here, it owns no real estate here, no employees are stationed here, and it never emailed or telephoned South Dakota.  Plaintiffs do not dispute these assertions.

In the Calder case, the defendants, authors of an allegedly libelous *National Enquirer* magazine article, argued that they had no contacts with California, the forum state, because—although they wrote the article (in Florida)—they were not responsible for *circulation* of the article in, among other places, California; the magazine itself undertook circulation.  Calder, 465 U.S. at 789.

The Court rejected this argument.  Id.  Although the defendants did not personally circulate their article in California, they "expressly aimed" "their intentional, and allegedly tortious, actions" at California.  Id.  Evidence showed

the article's authors knew the *National Enquirer* had its "largest circulation" in California and, because that is where the plaintiff lived and had her employment as a movie and television actress, the article would have "a potentially devastating impact" in California. Id. at 789-90. The Calder Court found sufficient minimum contacts to allow California to exercise jurisdiction. Id. at 788-89. Other facts supporting the minimum contacts analysis were that the writers had made phone calls to California sources for the information in their article, the article concerned the plaintiff's activities in California, and the reputational injury to plaintiff was experienced in California. Id.

In Walden, plaintiffs brought a Bivens[6] action in Nevada against a Georgia Drug Enforcement Agency (DEA) officer who intercepted plaintiffs in the Atlanta, Georgia, airport and seized $97,000 in cash from them. Walden, 571 U.S. at 279. The plaintiffs were bound for Nevada—Atlanta was merely a stopover in their journey—and they had a residence in Nevada. Id. at 280. The DEA agent seized the money and told plaintiffs it would be returned at a later time assuming they could demonstrate their possession of the money was legitimate. Id. The next day, plaintiffs' Nevada lawyer contacted the DEA agent via telephone and sought return of the money on plaintiffs' behalf. Id. On two subsequent occasions, the DEA agent received documentation from the same Nevada lawyer regarding the legitimacy of the funds. Id.

---

[6] Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971). The Bivens decision recognized a federal corollary to § 1983 actions by allowing plaintiffs to obtain money damages from federal employees who purposefully violate the plaintiffs' constitutional rights while acting under color of federal law.

The DEA agent drafted an allegedly false and misleading affidavit in support of forfeiture, which he forwarded to the United States Attorney's Office in Georgia. Id. at 280-81. Ultimately, no forfeiture complaint was filed and the DEA agent returned plaintiffs' money to them some seven months later. Id. at 281.

The Court held that the DEA agent did not have sufficient minimum contacts with Nevada to support personal jurisdiction over him there. Id. at 288. The Court emphasized that courts should not focus on the defendant's contacts with people within the forum—here, the plaintiffs—but rather with the forum itself. Id. at 288-89. The Court also cautioned that lower courts should not focus only on the fact that the harm may be felt in the forum state. Id. Here, the DEA agent never traveled to Nevada, all his actions in seizing the cash and drafting the affidavit took place in Georgia, he never conducted activities in Nevada, he never contacted any person in Nevada, and he never sent anyone or anything to Nevada. Id. The Nevada attorney's contact with the DEA agent was unilateral activity—it involved only the Nevada person contacting the DEA agent, not the reverse—and such unilateral activity could not alone support the exercise of jurisdiction. Id.

The Court criticized the lower court's conclusion that jurisdiction would lie merely because it was foreseeable that harm would occur in Nevada. Id. at 289. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Id. at 290. The Court noted the harm plaintiffs suffered

46

from denial of access to their money would have been suffered in any forum in which they happened to be, whether that was Nevada, California, Mississippi or anywhere else—unlike the harm in Calder which was uniquely tied to the forum state because the libelous article was written about events supposedly occurring in California where the plaintiff resided and worked.  Id.

Applying the five factors set forth by the Eighth Circuit, the court concludes there is no specific personal jurisdiction over KTCI based on its contacts with South Dakota.  (1) the only contact KTCI has with South Dakota is that its tire ended up here.  When evaluating a defendant's contacts with the forum state, physical entry into the forum either by the defendant in person, by an agent of the defendant, or by the defendant's goods, is "certainly a relevant contact."  Walden, 571 U.S. at 285 (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773-74, 781 (1984) (where defendant "deliberately exploited" a market in the forum state by circulating magazines there)).

Neither party shares with the court the percent of KTCI's tires that are sold in South Dakota, but KTCI sells only 22-24% of its total tires to North America, which includes the United States, Canada, and Mexico.  The combined population of North America is approximately 602 million.  See https://countrymeters.info/en/North_America. The population of South Dakota is 858,469.  See https://worldpopulationreview.com/states/south-dakota-population.  Assuming an even per capita distribution of KTCI's tires, one would expect 0.00034 percent of KTCI's North America tire sales to have

47

taken place in South Dakota.[7]  The percentage of KTCI's total tire sales that take place in South Dakota is infinitesimal.  This is not a meaningful contact.

The second factor, (2) the quantity of contacts KTCI has is singular:  only the fact of its tire being here.  The third factor, (3) the relation of the cause of action to the contact is direct—the cause of action arises directly out of the presence of KTCI's tire here.  The fourth factor, (4) the interest of the forum state in providing a forum for its residents is high, of course, but this factor is offset by the fact that plaintiffs have also sued the distributor of the tire, KTUSA, which has made a general appearance and has not contested jurisdiction.  This ensures plaintiffs have a forum and defendants with resources to sue in this forum.  The fifth factor, (5) is convenience of the parties.  This is a split factor; plaintiffs would be convenienced, but KTCI would be greatly inconvenienced.  Factors four and five are not as weighty in the analysis.

The <u>J. McIntyre Machinery, Ltd.</u> case is instructive.  There, a plaintiff in New Jersey was injured by a machine manufactured by J. McIntyre Machinery, Ltd. in England.  <u>J. McIntyre Mach., Ltd.</u>, 564 U.S. at 878.  The plaintiff brought a products liability action in state court in New Jersey and J. McIntyre contested personal jurisdiction.  <u>Id.</u>  J. McIntyre did not itself sell its machine in the United States.  <u>Id.</u>  Instead, J. McIntyre sold its products to a distributor which was not under J. McIntyre's control and the distributor sold the J. McIntyre machines in the United States.  <u>Id.</u>  J. McIntyre attended various

---

[7] $858,469 \div 602,000,000 = 0.00143$.  $0.00143 \times .24 = 0.00034$.

conventions in the United States to advertise its products, but never attended such a convention in New Jersey.  Id.  J. McIntyre held some United States patents on its technology.  Id.  In addition, the distributor accepted direction and guidance from J. McIntyre whenever possible in the distributor's advertising and sales activities.  Id. at 879.

The plaintiff, relying on World-Wide Volkswagen Corp., 444 U.S. at 298, argued that J. McIntyre was subject to New Jersey's personal jurisdiction because it had launched its product into the "stream of commerce" and that product ended up in New Jersey.  The Court in World-Wide had stated that if a manufacturer placed its goods into the stream of commerce "with the expectation that they will be purchased by consumers from the forum state," this may establish the defendant's purposeful availment of the forum.  J. McIntyre Mach., Ltd., 564 U.S. at 881-82 (citing World-Wide Volkswagen Corp., 444 U.S. at 298).  The plurality Court held in Justice Kennedy's opinion in J. McIntyre Mach., Ltd. this was a misinterpretation of its precedent.  Id. at 881-82.

The case of Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Co., 480 U.S. 102, 112 (1987) (O'Connor, J., concurring)[8], clarified that a manufacturer placing its product in the stream of commerce, standing alone, would never be enough to satisfy due process.  Instead, there would have to be other contacts, such as a showing the defendant intended to serve the market

---

[8] The Asahi Metal case was also a plurality opinion, with no five Justices agreeing on one analysis or outcome.

49

in the forum state by designing the product for the market in the forum state, advertising in the forum state, establishing channels for providing regular customer advice in the forum state, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state.  Id. The manufacturer's mere knowledge that his product will end up in the state after the manufacturer places the product into the stream of commerce is not sufficient.  Id.

Justice Kennedy's opinion in J. McIntyre Mach., Ltd. built on the statement in Asahi.  The opinion stated that the "stream of commerce" idea discussed in Asahi and World-Wide Volkswagen merely stated the "unexceptional proposition" that where a manufacturer specifically seeks to serve the forum state's market, personal jurisdiction may lie even without the manufacturer's personal presence in the forum.  J. McIntyre Mach., Ltd., 564 U.S. at 882.  "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State."  Id.

Analyzing the facts of the case before it, the Kennedy opinion noted that J. McIntyre may very well have sufficient minimum contacts with the *nation*, but the appropriate inquiry was whether it had sufficient contacts with *New Jersey*.  Id. at 886.  The plaintiff failed to establish that J. McIntyre purposefully directed any conduct toward New Jersey.  Id.  Aside from never attending any trade shows in New Jersey, the Court noted the manufacturer

50

never paid taxes there, did not own property there, had no office there, did not advertise there, and never sent any employees there.  Id.  In short, the only contact between J. McIntyre and New Jersey was that its machine ended up there.  Id.  The Court held New Jersey could not exercise personal jurisdiction over the English manufacturer.  Id. at 887.

Although the J. McIntyre opinion was a plurality opinion, Justice Breyer's concurring opinion also agreed that, under the facts presented, New Jersey could not permissibly exercise personal jurisdiction over J. McIntyre.  J. McIntyre Mach., Ltd., 564 U.S. at 887-93 (Breyer, J., concurring).  Therefore, six Justices agreed that, under the facts of the case, New Jersey could not exercise personal jurisdiction over the English manufacturer.[9]

After the fractured opinions in Asahi and J. McIntyre, the Court was able to issue a unanimous opinion authored by Justice Ginsburg in Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915 (2011).  There, the court held (unsurprisingly perhaps) that North Carolina could not exercise general personal jurisdiction over a foreign corporation in a lawsuit alleging a defective tire manufactured in Turkey, sold abroad, and involved in a fatal bus accident in France.[10]

---

[9] Three Justices--Ginsburg, Sotomayor and Kagan—would have held that New Jersey *could* exercise personal jurisdiction consistent with due process. J. McIntyre Mach., Ltd., 564 U.S. at 910 (Ginsburg, Justice, dissenting).

[10] The connection with North Carolina was that was the state of domicile of two of the decedents in the bus accident.  Goodyear, 564 U.S. at 918.

The North Carolina state courts had concluded they had general personal jurisdiction over the Turkish tire manufacturer because, even though the accident tire did not reach North Carolina, a small number of the Turkish tires did reach North Carolina. Id. at 919-20. Thus, the North Carolina courts—"confusing or blending general and specific jurisdictional inquiries" according to the Supreme Court—found general jurisdiction because the Turkish company had placed its tires into the "stream of commerce" and some of those tires landed in North Carolina. Id. This was error.

The parent company of the Turkish manufacturer, Goodyear USA, was a named defendant in the North Carolina suit and did not contest personal jurisdiction. Id. at 921. In contrast, the Turkish company was not registered to do business in the forum; did not have a physical presence there; held no bank accounts there; did not design, manufacture, or advertise their products in the forum; did not solicit business there, and did not themselves sell or ship tires to North Carolina. Id. Still, some of the Turkish defendant's tires were distributed in North Carolina by other affiliates of Goodyear USA. Id. These tires arrived in North Carolina without the Turkish manufacturer having undertaken any affirmative action to cause the tires to reach that destination. Id. at 922. The plaintiffs premised their jurisdiction argument on Goodyear USA's "highly-organized distribution process" through subsidiaries other than the Turkish company. Id. Because the accident did not occur in North Carolina, the plaintiffs necessarily invoked general personal jurisdiction. Id.

The Supreme Court clarified that stream-of-commerce considerations apply only to the concept of specific jurisdiction, and that even then it is only one among many contacts between the defendant and the forum to be considered.  Id. at 926-27.  The fact that a company placed its product into the stream of commerce and it ended up in the forum state is not a valid consideration under the doctrine of general jurisdiction.  Id.

In 2017, the Court issued an 8:1 opinion in Bristol-Myers Squibb Co. v. Superior Ct. of Calif., San Francisco Co, 582 U.S. ___, 137 S. Ct. 1773 (2017). There, the Court rejected California's assertion of specific jurisdiction for a products liability action over an out-of-state domestic drug manufacturer.  Id. at 1777-78.  There were 600 plaintiffs in the case, with 86 California residents and 592 residents of 33 other states.  Id.  The California courts had adopted what the Court termed a "sliding scale approach" to specific jurisdiction which the Court held confused the principles of general and specific jurisdiction:  the more general contacts the defendant had with the state, the less strong the connection between the forum and the specific claims at issue were required by the California court's reasoning.  Id. at 1781.  The Court rejected this approach, stating that "a corporation's continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity."  Id. (cleaned up).

The great preponderance of the plaintiffs had no connection with California—they did not buy, ingest, or suffer injury as a result of the drug, Plavix, in California.  Id.  The Court held the fact that the California plaintiffs

53

*did* have a connection with the forum and allegedly suffered the same injuries as the out-of-state plaintiffs was insufficient to establish specific jurisdiction. Id. The defendant had its principal place of business outside the forum, did not develop Plavix in the forum, did not create a marketing strategy for Plavix in the forum, did not manufacture, label, package or work on regulatory approval for Plavix in California. Id. at 1778. The mere fact that the defendant conducted research on *other* drugs in California, maintained a sales force in California, and hired a California company to distribute Plavix nationally was not sufficient to satisfy minimum contacts because these activities by the defendant were not connected to Plavix and the great majority of plaintiffs who brought suit in the litigation. Id. at 1781-83.

The Bristol-Meyers Court distinguished the Court's earlier decision in Keeton, stating that the Keeton plaintiff lived in the forum state, a substantial number of the defendant's magazines were distributed in the forum (as well as elsewhere), and the effects of the allegedly libelous statements would be felt by the plaintiff in the forum state. Id. at 1782 (discussing Keeton, 465 U.S. at 774, 776, and 778 n.9). The court noted the nature of harm resulting from libel harms both the subject of the falsehood as well as the readers—a fact the court held amply distinguished the facts of Keeton from the present case. Id.

The Eighth Circuit Viasystems case is also relevant. Viasystems, the plaintiff, was a Missouri corporation that undertook to manufacture telecommunications equipment for a Swedish company, to be installed in a mobile phone facility in Japan. Viasystems, 646 F.3d at 592. In order to fulfill

54

its contract, Viasystems purchased cooling fans manufactured by a German company in Germany.  Id.  The German fans were shipped through intermediaries from Germany to China to Japan; the fans at no time entered the United States.  Id.  Later, the German fans failed due to alleged manufacturing defects and Viasystems sued the German manufacturer in the Eastern District of Missouri, asserting contract and tort claims.  Id.  The defendant contested the district court's personal jurisdiction over it and the district court dismissed.  Id. at 591.  The Eighth Circuit affirmed.  Id. at 592.

The plaintiff argued the court had specific personal jurisdiction over the defendant because after the problem with the fans arose, the defendant sent several emails, made phone calls, made a partial payment to Viasystems for its losses, and the effects of the defendant's tortious conduct were felt by Viasystems in Missouri.  Id. at 593.  The court held that defendant's contacts with Missouri were simply not the type of "deliberate" and "substantial connection" with Missouri such that, consistent with due process, it could "reasonably anticipate being haled into court there."  Id. at 594.  The court also noted specific personal jurisdiction could not be premised on the effects of the tort being felt in Missouri without evidence the defendant's actions were intentional and were uniquely or expressly aimed at Missouri.  Id.

In Viasystems, the Eighth Circuit noted it had in the past adopted a variation of the stream-of-commerce test.  Id. at 597.  Under the Eighth Circuit test, mere placement of a product into the stream of commerce alone is insufficient to satisfy due process.  Id.  The court had, however, recognized

jurisdiction over a defendant who "pours its products" into a distribution network "with the expectation that the distributor will penetrate a discrete, multi-State trade area." Id. at 597 (citing Vandelune v. 4B Elevator Components Unltd., 148 F.3d 943, 948 (8th Cir. 1998)).

However, the Eighth Circuit appeared to concede that this "pouring of products" theory had itself been called into question by the Supreme Court in Goodyear. The court concluded by stating, "[o]ur precedent and the Supreme Court's decision in Goodyear make clear that even if a foreign corporation "pours its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area, that contact alone was too limited to serve as the basis for *general* jurisdiction." Id. (cleaned up). The Eighth Circuit specifically noted that its decision in Steinbuch v. Cutler, 518 F.3d 580 (8th Cir. 2008) "does not survive Goodyear." Viasystems, 646 F.3d at 597 n.4. The Steinbuch opinion applied stream of commerce in a general jurisdiction analysis. Steinbuch, 518 F.3d at 587-88.

The Vandelune case upon which the Viasystems court relied for its modified stream of commerce approach, appears to continue to be good law. In Vandelune, the plaintiff was injured in a grain dust explosion at a grain elevator and he brought products liability claims for defective design, manufacture, and failure to warn against Synatel, a British company which had manufactured a device designed to warn and shut down a grain elevator conveyor belt if there is a stoppage or slow down of the belt. Vandelune, 148 F.3d at 945. The device was manufactured by Synatel in Great Britain, sold to

56

Braime Elevator of Great Britain, distributed in America by 4B, which was a Braime affiliate in Illinois, then sold to a retailer in Iowa, which in turn sold the device to the plaintiff's Iowa employer, where the device was installed.  Id. at 945-46.  Synatel contested the Iowa court's exercise of personal jurisdiction over it.  Id. at 947.

The Eighth Circuit treated the question as to whether introducing a product in the stream of commerce was sufficient to establish personal jurisdiction as an open question because the Asahi court was split 4:4 on the question.  Id.  The court noted that if a product ends up in a forum state on an "attenuated, random, or fortuitous basis [then the defendant manufacturer] has not purposefully directed its activities at residents of that state" so as to satisfy due process requirements.  Id. at 948 (cleaned up).  However, the court held "when a foreign manufacturer pours its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-state trade area, the manufacturer has purposefully reaped the benefits of the laws of each state in that trade area for due process purposes."  Id. (cleaned up).

The evidence in the case, the court held, showed purposeful availment of the benefits of the Iowa market such that Synatel was properly subject to Iowa's jurisdiction.  Id.  Those facts included evidence Synatel designed its product specifically for the United States market in substantial grain elevators; that Synatel put decals distinctive to the ultimate distributor, 4B, on its products before shipping them; some of the products were shipped directly to

57

the American distributor, 4B, instead of going through the British distributor first; some Synatel employees attended technical support meetings at 4B's facilities only 80 miles from the Iowa border; and approximately 12 percent of the model product at issue manufactured by Synatel was resold in Iowa. Id. The court concluded these were not random, attenuated contacts with Iowa and that the Iowa court could permissibly exercise personal jurisdiction over Synatel. Id.

In Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 611, 615 (8th Cir. 1994), the court similarly found specific personal jurisdiction to exist over a Japanese fireworks manufacturer where between 51-92 percent of its product was sold (through intermediary distributors) in the United States and 16 percent of its fireworks were sold in the forum state of Nebraska. Id. The Japanese defendant also sent price lists, purchase terms, and shipping information, as well as proof of compliance with various American federal regulations, directly to distributors in the United States. Id. The court held the facts showed "more than reasonable foreseeability" to the Japanese defendant that it would be haled into court in Nebraska. Id. at 615.

In this case the only contact between KTCI and South Dakota is the presence of the Kumho accident tire here. There is no evidence that KTCI's actions constitute an intentional tort. There is no evidence KTCI uniquely or expressly aimed its actions at South Dakota. Unlike the grain elevator product involved in Vandelune, which by its very nature could be said to demonstrate the defendant targeted the midwestern "region" and "poured" its products into

58

that "region" (because grain is mostly harvested in the Midwest), here, the product is a tire, which is even more ubiquitous than the drug which was at issue in the Bristol-Meyers case.  A tire, like a drug prescribed for a common medical condition, can be expected to have wide and fairly even per capita distribution.  The fact that a Kumho tire ended up in South Dakota in the present case is not as persuasive evidence of KTCI's targeting of South Dakota as was the fact that a grain elevator product ended up in Iowa, as in Vandelune.

Aside from the presence of the tire here and the effects of the non-intentional tort being felt here, there is no other connection between South Dakota and KTCI.  The connections between KTCI and South Dakota are not as attenuated as the contacts between the Turkish tire manufacturer and North Carolina in the Goodyear case.  But they are also not the kind of substantial contacts found to support jurisdiction in Barone and Vandelune; the contacts are more like the attenuated contacts in Viasystems and Bristol-Meyers.

A defendant who sends its product but not any of its agents into a forum will be subject to the forum's personal jurisdiction "only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." J. McIntyre Mach., Ltd., 564 U.S. at 882 (opinion of Kennedy, J.).  While a Kumho tire clearly made its way into South Dakota, there is no showing that KTCI purposefully directed its activities toward South Dakota, toward a multi-state region including South Dakota, or that its sales of tires in South Dakota

were of such volume that "more than reasonable foreseeability" is involved regarding the potential to be haled into court here.  Barone, 25 F.3d at 615.

In regard to sales of Kumho tires, Heavy's counsel states in his brief that "Kumho describes *its* dealer channel as 'the largest channel in the tire business, with an estimated 61.5 percent share in 2018.' "  See Docket No. 89 at p. 12 (citing Docket No. 50-7) (emphasis added).  This is quoted out of context and leads to a mistaken inference that Kumho has 61.5 percent of the tire market.  In fact, the document cited to describes Kumho's market position as "bottom second-tier tire manufacturer."  See Docket No. 50-7 at p. 4.  The document goes on to state that KTUSA (not KTCI) "will continue to sell through the independent tire dealer channel, which remains the largest channel in the tire business, with an estimated 61.5 percent share."  Id. at pp. 5-6.  The context of the article makes clear that the "channel" being referenced is not a channel of dealers belonging to KTCI, KTUSA, or Kumho, but rather a channel that exists *in the tire industry in America*.  As the article goes on to say, "the best way for [KTUSA] to get out and talk about our brand," is selling to independent tire dealers "because *our industry* is still dominated by independent tire dealers."  Id.  In other words, Kumho is an outsider and can best market its tires through independent dealers instead of brand-dedicated dealers.  This does not change the miniscule share of Kumho tires sold in the state of South Dakota.

Heavy also argues a KTUSA regional manager for the multistate area of South and North Dakota, Minnesota, Wisconsin and northern Michigan

60

boasted of $20 million in tire sales for KTUSA.  <u>See</u> Docket No. 89 at p. 12.

Firstly, the document cited is a puff piece from the regional manager himself

touting his past experience (he was currently a salesman for Kendra tires), so

the figure is suspect.  Secondly, the statement concerns sales made in 2007-

09, which is 7-9 years before the accident at issue in this case and is,

therefore, of questionable relevancy.  And, thirdly, this figure does not alter the

total tiny fraction of 1 percent of Kumho tires that are sold in South Dakota.

In the <u>Vandelune</u> case, 12 percent of the manufacturer's product was

sold in Iowa.  <u>Vandelune</u>, 148 F.3d at 948.  In the <u>Barone</u> case, 16 percent of

the manufacturer's product was sold in Nebraska, and 51-92 percent in the

United States.  <u>Barone</u>, 25 F.3d at 611.  Here, an infinitesimal fraction of 1

percent of Kumho's total tires are sold in South Dakota, and an unknown

percentage is sold in the United States, and only 24 percent is spread over the

entirety of North America.  These facts are insufficient to establish specific

personal jurisdiction over KTCI in South Dakota.  <u>Bristol-Meyers Squibb Co.</u>,

137 S. Ct. at 1784; <u>J. McIntyre Mach., Ltd.</u>, 564 U.S. at 887; <u>Viasystems</u>, 646

F.3d at 594-95.  <u>See also</u> <u>Humble v. Toyota Motor Co., Ltd.</u>, 727 F.2d 709 (8th

Cir. 1984).  In <u>Humble</u>, the court rejected the stream of commerce argument

and held the Northern District of Iowa could not exercise personal jurisdiction

over a Japanese seat manufacturer in a products liability action.  The

defendant manufactured its seats in Japan and gave them to Toyota in Japan.

Toyota installed them in Toyota vehicles, and Toyota in turn sold some of those

vehicles containing defendant's seats in Iowa.  <u>Id.</u> at 710-11.  <u>And see</u>, <u>Hutson</u>

v. Fehr Bros., Inc., 584 F.2d 833, 837 (8th Cir. 1978) (holding Western District of Arkansas could not exercise personal jurisdiction over foreign chain manufacturer in a products liability case where the defendant merely sold the chain to a distributor who in turn brought the chain to the United States and sold it here).[11]

As Justice Kennedy observed in the J. McIntyre case, KTCI's contacts may very well be sufficient to demonstrate minimum contacts with North America, or even the United States, but they do not demonstrate sufficient contacts with South Dakota.  J. McIntyre Mach., Ltd., 564 U.S. at 886 (opinion of Kennedy, J.).

Heavy points to regional Kumho tire dealers assigned to South Dakota (agents/distributors), but these are agents of KTUSA, not KTCI.  Heavy also points to advertising contracts that KTCI's president announced KTCI had negotiated, but none of those advertising contacts are with South Dakota.  Heavy produces a photo of a Kumho brand insignia on a Sioux Falls basketball hoop used by the Sioux Falls Skyforce basketball team, but there is no indication whether the agreement to place that logo in that location was negotiated by KTUSA or by KTCI.  It is true that in its annual report, KTCI makes no distinction between these advertising efforts by KTUSA and itself, but the majority of the contacts are clearly those of KTUSA, not KTCI.  The extent

---

[11] Both Humble and Hutson were cited approvingly in Justice O'Connor's opinion in Asahi (see Asahi Metal Indus. Co., Ltd., 480 U.S. at 111).

to which KTUSA's contacts can be imputed to KTCI is discussed in the next two sections.

### 3.    Alter Ego Theory

Typically, parent corporations are not liable for the acts of their wholly owned subsidiaries.  United States v. Bestfoods, 524 U.S. 51, 61 (1998). However, where "the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the [subsidiary] corporation to act as the [parent] corporate defendant's alter ego," then the "subsidiary's contacts [with the forum] are those of the parent corporation's, and due process is satisfied."  Epps v. Stewart Information Servs. Corp., 327 F.3d 642, 649 (8th Cir. 2003).

In Epps, the question was whether personal jurisdiction could be exercised over a non-resident parent corporation based on the contacts between the subsidiary corporation's contacts with the forum.  Id.  Similarly, in Van Dusseldorp, the plaintiff tried to make a case for exerting personal jurisdiction over the parent corporation based on the admitted jurisdiction over the subsidiary.  Van Dusseldorp, 2017 WL 4004421 at *5-6.  Here, KTCI is the parent corporation which wholly owns the stock of its subsidiary, KTUSA.

If the corporation over whom a plaintiff asserts personal jurisdiction fails the specific jurisdiction test, there is the suggestion in Epps that asserting jurisdiction via the alter ego theory must demonstrate general jurisdiction over the related corporation over which the court concededly *does* have jurisdiction. Epps, 327 F.3d at 650 (stating "for purposes of specific personal jurisdiction,

63

we must consider whether [the parent corporation] itself had minimum contacts with [the forum] to subject itself to the personal jurisdiction of the District Court.  If direct minimum contacts are not present, we must determine whether we can properly pierce [the subsidiary's] corporate veil under the alter-ego approach to *establish general personal jurisdiction* over [the parent.]") (emphasis added).  The court is dubious whether *general* jurisdiction can be established over KTUSA, but neither party addresses this issue.  Instead, both address only specific jurisdiction over KTUSA.  For purposes of the following discussion, the court assumes one can obtain alter ego or "close relationship" personal jurisdiction over a parent corporation if one can establish specific jurisdiction over the subsidiary (other factors for such jurisdiction having been met).

State law applies to determine whether and how to pierce the corporate veil.  Epps, 327 F.3d at 649.  Under South Dakota law, a parent corporation is liable for the acts of its subsidiary if there is an agency relationship between the two corporations.  Glanzer v. St. Joseph Indian Sch., 438 N.W.2d 204, 207 (S.D. 1989).  Another exception exists under the instrumentality exception if the plaintiff can show (1) the parent controls the subsidiary to such an extent that the subsidiary is rendered a mere instrumentality of the parent; and (2) adhering to the rule of corporate separateness would be unjust or inequitable. Id.

Under the first factor of the instrumentality test, the South Dakota Supreme Court has identified a number of factors to consider:  whether the

parent owns most of the subsidiary's capital stock, whether the two corporations have common directors or officers, whether the parent finances the subsidiary, whether the parent subscribes to all of the subsidiary's stock or otherwise causes the subsidiary to be incorporated, whether the subsidiary is grossly undercapitalized, whether subsidiary corporate officers' salaries or other expenses are paid by the parent, whether all the subsidiary's business is with the parent, whether the subsidiary's assets were conveyed to it by the parent, whether the parent describes the subsidiary as a department or division of the parent, whether the parent uses the subsidiary's property as its own, and whether the subsidiary's officers and directors act in the best interests of the subsidiary or the parent. Id.  This District has summarized the factors pithily:  has the plaintiff shown that "the subsidiary is a dummy or a sham corporation or undercapitalized"? Van Dusseldorp, 2017 WL 4004421 at *7 (citing Bestfoods, 524 U.S. at 69-70).

In Epps, the court rejected the alter ego theory of personal jurisdiction where plaintiffs proved the subsidiary corporation was wholly owned by the parent and the parent claimed the subsidiary's assets and liabilities as its own. Epps, 327 F.3d at 650-51.  In Epps, there was an intervening level of corporate existence that plaintiffs did not explore or explain.  Id.  Under these circumstances, the overlapping ownership evidence was simply "too distant and limited a contact" to satisfy due process.  Id. at 650.

In the Van Dusseldorp case, the court found the plaintiff failed to establish evidence of mere instrumentality.  Van Dusseldorp, 2017 WL

4004421 at *5.  Significantly, plaintiff did not establish the subsidiary was undercapitalized; that the parent financed the subsidiary, that the parent paid the salaries/expenses of the subsidiary, that the parent used the subsidiary's property as its own, that the subsidiary had no business apart from the parent's, or that the legal requirements of the subsidiary had not been observed.  Id.  Therefore, even though the parent appointed the officers and directors of the subsidiary and indirectly owned the subsidiary through an intermediary company, this was not sufficient to carry plaintiff's burden of proof.  Id.

Here, KTCI owns all of KTUSA's stock.  They are insured under a common liability insurance policy with a single premium.  However, there is no evidence KTUSA is undercapitalized.  The two corporations share a common Human Resources department.  They share the same computer platform, but KTCI has limited access to data KTUSA has stored on its own platform.

Although Heavy alleges corporate officers under the Kumho umbrella work their way up through the corporate ladder by serving at different subsidiaries, Heavy has not alleged that KTCI and KTUSA have any directors or officers in common.  KTCI has provided an affidavit establishing they do not.

KTUSA presumably has no business except that of the parent's.  Also, Heavy represents that the sales of tires that take place between the two corporations do not contain the types of arms-length documents and assurances typical in commercial transactions in goods between two separate companies.

66

KTCI financed and built a research and development plant in Georgia and funneled the money through KTUSA as a pass-through entity, but that appears to be the only financial connection. KTCI does not pay KTUSA's employees or officers, has not underwritten any financing for KTUSA, and has not loaned any money to KTUSA. KTCI's annual report for 2016 lends itself to the impression that KTUSA is simply an arm of KTCI, but the actual corporate formalities appear to have been observed. Like the Van Dusseldorp case, Heavy has failed to establish undercapitalization of KTUSA, parent financing of KTUSA, KTCI paying KTUSA's employees' salaries, KTCI using KTUSA's property as its own, or that legal requirements have not been observed.

In Van Dusseldorp, the parent appointed the officers and directors of the subsidiary, and the court still found the alter ego theory to be inapplicable. Van Dusseldorp, 2017 WL 4004421 at *6. The Epps court found the parent claimed the subsidiary's assets and liabilities as its own, and the court declined to find personal jurisdiction through the alter ego theory. Epps, 327 F.3d at 650-51. Heavy does not even show that much here. Heavy has not shown KTUSA to be a mere sham or dummy corporation. The court concludes alter ego personal jurisdiction does not apply.

Heavy argues it would be unjust or inequitable to observe the rule of corporate separateness. Heavy has asserted, among others, claims for strict products liability. See Docket No. 12 in 5:19-cv-5044. Heavy alleges, citing SDCL § 20-9-9, it will not be able to hold KTUSA liable for damages unless Heavy can prove KTUSA knew or should have known of the tire defect.

Further, Heavy suggests it is inequitable if KTCI cannot be held liable in any jurisdiction in the United States.

Taking the last assertion first, the court notes that Heavy has *not* shown that KTCI is not amenable to personal jurisdiction anywhere in the United States. Heavy points to several lawsuits in various domestic jurisdictions where KTCI has appeared and not contested personal jurisdiction. The court assumes Heavy could have sued KTCI in strict liability in any of those jurisdictions. In addition, KTCI has a physical presence—a research and design facility—in Akron, Ohio. The court also assumes KTCI would be amenable to suit in Ohio. KTCI built a plant in Georgia, as well, leading to the possibility it would be subject to personal jurisdiction there too. Just because KTCI is not subject to personal jurisdiction in South Dakota does not necessarily lead to the conclusion that result is inequitable. Like the plaintiffs in many cases discussed above, Heavy may have had to bring suit outside of South Dakota if it wanted to sue KTCI along with KTUSA. That is not the question before the court. The question is whether KTCI is subject to personal jurisdiction here and the conclusion of this court is that it is not.

Likewise, the fact that the law provides a higher hurdle to hold KTUSA liable in South Dakota is a distinction without a difference and does not lead to the conclusion failure to find jurisdiction against KTCI is inequitable. As discussed above, there are potentially a number of other forums in the United States in which KTCI could be sued. As long as there was some connection to

the venue, Heavy was free to choose that jurisdiction with the law most favorable to it.

### 4. **Close Relationship**

In the same vein as the alter ego theory, Heavy asserts there is personal jurisdiction over KTCI because there is a "close relationship" between KTCI and KTUSA. Plaintiffs cite Viasystems, already discussed above, and Anderson v. Dassault Aviation, 361 F.3d 449 (8th Cir. 2004), in support of this assertion.

The Anderson case involved, again, a fact pattern involving a puppeteer-parent corporation that was outside the forum, and a puppet-wholly-owned subsidiary corporation that was inside the forum. Anderson, 361 F.3d at 452. The Anderson case is distinguishable because the actions of the puppet-subsidiary in the forum went well beyond the mere ownership and control by the parent.

In Anderson, in a very real sense, the product (an airplane) was partially manufactured in the forum by the subsidiary. Id. at 451-52. There is no allegation in this case that KTUSA or KTCI finishes manufacturing Kumho tires in South Dakota.

In addition, the parent company in Anderson prominently featured its subsidiary's production plant in the forum in its marketing and shareholder materials. Id. at 453. Finally, the majority of the parent corporation's planes were brought into the forum state to be finished at the subsidiary's plant there. Id. There is no evidence in this case that any literature of any of the three defendants mentions South Dakota at all, let alone prominently features South

Dakota.  There is no evidence that the majority of Kumho tires pass through South Dakota—in fact, the evidence is that an impossibly small fraction of a percent of Kumho's tires arrive in South Dakota.  The court rejects the "close association" argument in this case.  The facts simply do not support the application of that precedent herein.

### 5.    Federal Rule of Civil Procedure 4(k)(2)

One of the bases urged by Heavy as grounds for exercising personal jurisdiction over KTCI is FED. R. CIV. P. 4(k)(2).  That rule allows a federal district court to exercise personal jurisdiction over a defendant if:  (1) there is a federal claim in the lawsuit, (2) the defendant is served with a summons, (3) the defendant is not subject to personal jurisdiction in any state's courts of general jurisdiction, and (4) exercising jurisdiction is consistent with the United States Constitution and laws.  See FED. R. CIV. P. 4(k)(2).

Heavy premises its invocation of Rule 4(k)(2) on the presence of its Magnuson-Moss claims to establish the existence of a federal claim in this lawsuit.  However, as discussed above, the Magnuson-Moss claim is allowed to go forward in this case only because it falls within the discretionary grant of supplemental jurisdiction allowed under § 1367.  The court has specifically found that Heavy has failed to demonstrate that it met the $50,000 amount in controversy requirement in order to treat the Magnuson-Moss claim as a federal claim.  Thus, there is no federal claim over which this court can exercise federal question jurisdiction sufficient to rely upon Rule 4(k)(2) in

order to establish personal jurisdiction over KTCI.  The court therefore rejects the argument that it can establish personal jurisdiction via Rule 4(k)(2).

The court's conclusion that it does not have original federal jurisdiction over Heavy's Magnuson-Moss claim also defeats Heavy's argument that this court should exercise common law pendent personal jurisdiction over KTCI.  As noted in this court's previous opinion evaluating personal jurisdiction over Kumho Vietnam, before a court can exercise pendent personal jurisdiction over a particular defendant on a particular claim, there must be another separate claim over which the court clearly *does* have personal jurisdiction over that defendant.  See 13D Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Pro., § 3567 (3d ed. Aug. 2019 update).  Heavy's assertion of common law pendent personal jurisdiction is premised on this court having federal question jurisdiction over its Magnuson-Moss claim.  Because the court has concluded it does not have federal question jurisdiction over that claim, it cannot exercise common law pendent personal jurisdiction on the basis of that claim.

## E.    Heavy's Request to Conduct Discovery

This court has concluded that Heavy has failed to carry its burden of establishing a *prima facie* showing of jurisdiction with evidence viewed in the light most favorable to the plaintiff.  Whaley, 946 F.3d at 451.  Heavy has failed to alleged facts sufficient "to support a reasonable inference that defendant may be subjected to jurisdiction in the forum state." Van Dusseldorp, 2017 WL 4004421 at *2.  In the alternative, Heavy asks this court to allow limited discovery to flesh out KTCI's contacts with South Dakota and to explore the

corporate relationship and level of control between it and KTUSA.  Heavy provides an affidavit in support of its request.  See Docket No. 91.

In this court's opinion, the question whether Heavy made out a *prima facie* case is not a close one.  The evidence overwhelmingly leads to the conclusion there is no personal jurisdiction over KTCI, either in its own right or because of its association and relation to KTUSA.  Although Heavy stated in its affidavit that it had served KTUSA with discovery requests and not gotten any response, KTUSA thereafter served Heavy with its responses to Heavy's discovery requests, so that is no longer the case.  Heavy has not sought to supplement its showing on the motion to dismiss with any of the discovery responses provided to it.

Many of the factual showings Heavy has attempted to make to establish personal jurisdiction in connection with this motion were speculative, conclusory, and taken out of context.  This court does not believe, on the record before it, that Heavy has established grounds for obtaining discovery against KTCI and therefore denies that request.

In recommending that no further discovery be allowed as to KTCI and this court's personal jurisdiction over it, the court is mindful that Heavy has not been allowed to conduct full-throated discovery in this case.  Balanced against that is KTCI's very real due process right not to have to engage in significant litigation in a forum in which is it not constitutionally amenable to suit.  The final factor informing the court's decision is this:  the only remaining claim in this action against KTCI is Heavy's Magnuson Moss Warranty Act

claims.  The Magnuson Moss claims are minor compared to the other claims and the court's jurisdiction to entertain those claims against KTCI rests on discretionary, not mandatory jurisdiction.  The court believes these factors militate against allowing Heavy to engage in extensive personal jurisdiction discovery against KTCI solely for the purpose of sustaining the Magnuson Moss claims, which are only before the court on discretionary jurisdiction in any event.

Nevertheless, if the district court upon review of this opinion determines some jurisdictional discovery should be allowed, this court would not recommend allowing inquiry into the extensive laundry list included in Heavy's affidavit.  The discovery should be surgically tailored to the two things Heavy needs to prove in order to show jurisdiction over KTCI:  (1) KTCI's actual contacts with South Dakota in its own right, and (2) the nature of the relationship between KTCI and KTUSA, limited to the factors outlined by the court above in connection with the alter ego theory and South Dakota law on piercing the corporate veil.  KTCI's affidavit from Myeongseon Kim already addresses these issues.  See Docket No. 80-05.  Perhaps as a limited first step, if the district court is so inclined, a deposition of Mr. Kim regarding the assertions made in his affidavit, would be appropriate should the court determine to allow discovery.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends granting KTCI's motion to dismiss all claims against it

73

[Docket No. 79] for the reasons that the statute of limitations bars the state law claims and there is no personal jurisdiction over KTCI in South Dakota sufficient to allow it to maintain the Magnuson-Moss Warranty Act claims.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED May 8, 2020.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge