UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRIGITTE JAHNER, as personal representative of the Estate of Robert Bear Shield, JERRY BEAR SHIELD SR., JERRY BEAR SHIELD JR., JAYDEE SPOTTED ELK, AMERICAN ZURICH INSURANCE COMPANY and HEAVY CONSTRUCTORS, INC., | CIV. 18-5036-JLV |
| Plaintiffs, | ORDER |
| vs. | |
| KUMHO TIRE U.S.A., INC., KUMHO TIRE MERGER SUBSIDIARY, INC., KUMHO TIRE CO. INC., and KUMHO TIRE (VIETNAM) CO., LTD., | |
| Defendants. | |

**INTRODUCTION**

This case arises out of a fatal June 22, 2016, motor vehicle accident. Plaintiff Heavy Constructors, Inc. ("Heavy") employed Robert Bear Shield, Justin Hawk Wing and Jaydee Spotted Elk. The three were in a work truck that overturned, killing Mr. Bear Shield, seriously injuring Mr. Hawk Wing and injuring Mr. Spotted Elk. The plaintiffs allege a Kumho tire on the truck separated, causing the accident. Two complaints were filed in this court, each alleging various product liability claims related to the tire. See Docket 1; Am. Zurich Ins. Co. et al. v. Kumho Tire Co., Inc. et al., Civ. 19-5044 (Docket 12)

(D.S.D. July 26, 2019) ("Zurich amended complaint").   The court consolidated the cases.   (Docket 23).

The first set of plaintiffs consist of Mr. Bear Shield's family members, the representative of his estate, and Mr. Spotted Elk ("Bear Shield plaintiffs").   The Bear Shield plaintiffs originally sued only defendants Kumho Tire, U.S.A. ("KTUSA") and Kumho Tire Merger Subsidiary, Inc. ("Kumho Tire Merger"). They have repeatedly attempted to amend their complaint to add Kumho Tire Co., Inc. ("KTCI") and Kumho Tire Vietnam Co., LTD. ("KTV") as defendants. United States Magistrate Judge Veronica L. Duffy rejected the Bear Shield plaintiffs' latest attempt to amend their complaint.   (Docket 59).   Although the Bear Shield plaintiffs did not object to the magistrate judge's order, they later filed two motions to reconsider the order on various grounds which remain pending before the court.   (Dockets 75 & 122).

The second set of plaintiffs ("Zurich plaintiffs") are Heavy Constructors and insurer American Zurich, which paid workers' compensation benefits to Mr. Hawk Wing.   The Zurich plaintiffs sued KTUSA, KTCI and KTV in an amended complaint.   KTV and KTCI moved to dismiss the amended complaint for lack of personal jurisdiction and because the applicable South Dakota statute of limitations had allegedly run.   (Dockets 38, 39, 79 & 80).   The court referred the motions to Magistrate Judge Duffy pursuant to 28 U.S.C. § 636(b)(1)(B) and its standing order of October 16, 2014.   (Dockets 43 & 81).   The magistrate judge concluded in two reports and recommendation ("R&R") that the court has

2

no personal jurisdiction over KTV and KTCI.   (Dockets 67 & 102).   She also held KTCI's claims were barred by South Dakota's statute of limitations. (Docket 12).   The Zurich plaintiffs objected to both R&Rs.   (Dockets 68 & 104) KTCI also objected to the R&R on its motion to dismiss.   (Docket 103).

Upon objection to a R&R on a dispositive motion, the court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   28 U.S.C. § 636(b)(1).   The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   Id.   The court finds the Zurich plaintiffs must have the opportunity for limited jurisdictional discovery before a conclusive finding as to personal jurisdiction over KTCI and KTV—upon which other arguments for dismissal depend—can be made.[1] Accordingly, the court denies the motions to dismiss without prejudice to renewal.   The court further denies the Bear Shield plaintiffs' motions for reconsideration.

## I.   Facts

This factual recitation is drawn from the Zurich plaintiffs' amended complaint and the "affidavits and exhibits" the parties submitted on the motions to dismiss.   K-V Pharm. Co. v. J Uriach & CIA, S.A., 648 F.3d 588, 591-92 (8th Cir. 2011).   Because the court will not hold an evidentiary hearing at this stage

---

[1]The court denies the Zurich plaintiffs' request for oral argument.

3

of the case, the court views the facts in the light most favorable to the Zurich plaintiffs.   <u>Pederson v. Frost</u>, 951 F.3d 977, 979 (8th Cir. 2020).

The basic allegations concerning the motor vehicle accident are recited above.   The Zurich plaintiffs allege the tire which caused the accident by "suddenly and unexpectedly separat[ing]" was a Kumho LT 265/17/16 tire. Zurich amended complaint at ¶¶ 19, 26.   The tire was "represented and marketed" to Heavy for use on the work truck involved in the accident.   <u>Id.</u> at ¶ 21.   Heavy properly installed and maintained the tire.   <u>Id.</u> at ¶¶ 23, 24.

KTCI is a South Korean tire company that operates in the American market.   <u>Id.</u> at ¶¶ 3-4.   It designed the tire involved in the accident.   (Docket 80-5 at ¶ 31).   However, it did not issue any warranty for the tire.   <u>Id.</u> at ¶ 42. According to a November 18, 2019, article by Tire Review, which appears to be an industry publication, "North America makes up 29% of [KTCI's] global sales[.]" (Docket 50-3 at p. 6).   KTCI operates a research and development center in Akron, Ohio.   (Docket 80-5 at ¶ 3).   However, Myeongseon Kim, KTCI's Managing Director of Quality, stated in an affidavit that KTCI has no direct links to South Dakota.   <u>Id.</u> at ¶¶ 4-28.   In particular, KTCI is not registered to conduct business in South Dakota, has no assets or employees in South Dakota, did not design any product "specifically for the South Dakota market[,]" and "does not derive any revenue directly from South Dakota."   <u>Id.</u> at ¶¶ 5, 8, 17-19, 25.

In 2010, KTCI issued a press release heralding the beginning of a marketing campaign targeting American college football audiences.   (Docket 49-6).   In KTCI's 2016 annual report, it announced sponsorship deals with the National Basketball Association and its sub-league.   (Docket 48-6 at p. 3).   The agreements included placing KTCI's logo on "basketball stands."   Id.   The Zurich plaintiffs' briefs include a photograph of a basketball stand purportedly in Sioux Falls, South Dakota, that has a "KUMHO TIRE" logo.   (Dockets 89 at p. 13 & 104 at p. 23).   Mr. Kim states in an affidavit that KTCI has no sponsorship agreement with the NBA or any American basketball team and it does not advertise at all in South Dakota.   (Docket 112-1 at ¶ 5).   He asserts KTUSA sponsors the NBA and its "developmental league[,]" including the Sioux Falls basketball team.   Id. at ¶ 6.

According to GyuSik Cho, KTV's Deputy General Director of Planning & Administration, KTV manufactured the tire at issue in 2012 at its factory in Vietnam's Binh Duong province.[2]   (Docket 39-5 at ¶ 25).   Mr. Cho's affidavit states KTV would have surrendered ownership of the tire to KTUSA at a Vietnamese port, if indeed KTUSA distributed the tire.   Id. at ¶ 26.   KTCI "has provided guarantees for the operations of its overseas subsidiaries," including

---

[2]The Zurich plaintiffs assert KTCI "designed" KTV's factory "to be a hub of exports to the US and European markets."   (Docket 46 at p. 4).   The document cited in support of this fact is a KTCI press release about a manufacturing plant in Georgia.   (Docket 48-10).   The press release mentions KTV's plant, but does not connect the plant to the American market.   Id. at p. 2.

KTV.[3]   (Docket 48-2 at p. 3).   Mr. Cho asserts KTV has no direct contacts with South Dakota of any kind.   (Docket 39-5 at ¶¶ 4-24).   In particular, KTV does not take orders directly from South Dakotans and has not shipped any tires directly to South Dakota.   Id. at ¶¶ 13, 24.

KTUSA is an American company which maintains its principal place of business in Georgia.   (Docket 26 at ¶ 10).   It admitted the Zurich plaintiffs' allegation that it is wholly owned by KTCI.   Id.; see also Docket 101-5 at p. 12 ("KTCI has owned 100% of the stock of KTUSA at all times relevant to this lawsuit.").   KTUSA "is in the business of selling and distributing Kumho brand tires."   Id. at ¶ 11.   According to an interrogatory response, KTUSA "distributed the subject model and size tire to entities within the State of South Dakota in 2012 and 2013."   (Docket 101-5 at p. 10).   It sells tires "through the independent tire dealer channel, which" holds "an estimated 61.5 percent share [of tire sales] in 2018[,]" according to a speech Shawn Denlein, a KTUSA executive, gave in 2018 during a conference with "key tire dealer and wholesaler customers[.]"   (Docket 50-7 at pp. 3, 5).   Its website allows tire retailers to obtain Kumho branded tires for sale and directs consumers to nearby retailers. (Dockets 48 at ¶ 30 & 50-9 at pp. 3-7).   In 2007, according to an article by Modern Tire Dealer, which appears to be an industry publication, KTUSA named

---

[3]The Zurich plaintiffs assert KTCI wholly owns KTV through its ownership of Kumho Tires Hong Kong, but none of its cited materials establish that fact. (Docket 46 at p. 4).   The record shows that KTCI wholly owns Kumho Tires Hong Kong and that it referred to KTV as its subsidiary in its 2011 annual report. (Docket 48-2 at pp. 2-3).

a regional sales manager with responsibility for the upper Midwest region, including South Dakota.   (Docket 49-7).   The Zurich plaintiffs also filed a LinkedIn profile for a person purporting to be KTUSA's regional sales manager for the Pacific Northwest region, including South Dakota, since 2006.   (Docket 49-9).

The Zurich plaintiffs allege KTV and KTUSA are corporate alter egos of KTCI.   Zurich amended complaint at ¶¶ 7 & 15.   They generally assert KTV and KTUSA are controlled by KTCI through financing and common management to the exclusion of their own independent interests.   Id.   As evidence for this theory as to KTUSA, the Zurich plaintiffs proffer a Korean insurance policy certificate which names KTCI, KTUSA, Kumho Canada Inc. and Kumho Tire Georgia Inc. as insureds.   (Docket 101-3).   The "territory/jurisdiction" for the policy is limited to the United States and Canada.   Id. at p. 1.   KTCI filed a 2008 "Intercompany Agreement" in which it appointed KTUSA "as the non-exclusive distributor" of its tires in the United States.[4]   (Docket 112-2 at p. 2).   KTCI and KTUSA agreed to determine tire prices "so as to allow [KTUSA] to achieve an arm's length profitability."   Id. at p. 5.   KTCI asserts KTUSA purchases its tires electronically.   Docket 112 at p. 6; see also Dockets 112-3 & 112-4 (sample purchase forms).   In interrogatory responses, KTUSA stated it had no

---

[4]The agreement automatically renews year-to-year unless either party objects.   (Docket 112-2 at p. 6).   No party informs the court whether the agreement is presently in effect.

documents responsive to requests for information about tire quality control or for bills of lading relating to the tire at issue.   (Docket 101-5 at pp. 17, 32).

The Zurich plaintiffs also point to a tire manufacturing plant in Georgia. KTUSA owns the stock of Kumho Georgia.   (Docket 101-5 at pp. 11-12). Kumho Georgia operates the plant.   (Docket 105-2) (financing agreement for plant).   "Kumho Parent"—which seems to refer to KTCI—guaranteed the plant's financing.   Id. at pp. 2-3.   KTUSA stated in response to an interrogatory that KTCI "capitalized" Kumho Georgia "in conjunction with the construction and beginning operations" of the plant, with the money "pass[ing] through" KTUSA. (Docket 101-5 at pp. 11-12).   In its 2015 annual report, KTCI described the plant as "the first production base for Kumho in a region outside Asia[.]" (Docket 48-5 at p. 9).

Finally, in their objections, the Zurich plaintiffs assert KTUSA is undercapitalized and dependent on funds from KTCI.[5]   (Docket 104 at pp. 29-30).   A PricewaterHouseCoopers audit included in KTCI's 2010 annual report showed KTUSA had a net asset value of approximately negative $25.5

_____

[5]The Zurich plaintiffs list figures in support of their argument which are not found in the cited material.   For example, they assert KTCI absorbed a $58 million loss in 2010.   (Docket 104 at p. 29) (citing Docket 105-1 at p. 7).   This figure does not appear in the cited page, nor can the court deduce how the Zurich plaintiffs arrived at it.   The court likewise cannot validate their assertion that KTCI made capital investments in its subsidiaries of $1.3 million in 2010.   Id. at p. 29 (citing Docket 105-1 at p. 2).

million in 2010.[6]   (Docket 105-1 at p. 6).   The 2010 audit used Korean accounting principles, which apparently includes the equity method.   <u>Id.</u> at pp. 1 & 5.   This method accounts for KTCI's influence over its subsidiaries in calculating a subsidiary's value.   <u>Id.</u> at p. 6.   The auditor did not use the equity method in accounting for KTUSA's value in 2010 "due to [its] accumulated losses."[7]   <u>Id.</u> at p. 7.   KTCI also listed amounts invested in its subsidiaries in various reports.   In 2018, for example, KTCI invested approximately $327.7 million in its subsidiaries.   (Docket 105-6 at p. 7).   The report does not specify which subsidiaries received funds.

Anecdotal evidence also indicates connections between the companies. In a 2018 promotional publication, KTUSA described itself as "one of the world's leading tire manufacturers[.]"   (Docket 50-12).   In a publication describing its "sustainability management results" for "stakeholders," KTCI discussed "better communication between the head office and the rest of the corporate units." (Docket 50-5 at p. 3).   The Atlanta Business Chronicle described KTUSA as "the U.S. sales, marketing, product development and distribution arm of South

---

[6]The report lists figures in Korean won, which the court converted to dollars.

[7]The report shows KTUSA's net assets increased by approximately $32.6 million in 2010, although it remained at a loss that year.   (Docket 105-1 at p. 7).

Korea-based [KTCI].”[8]   (Docket 50-6 at p. 2).   An anonymous employee wrote in an online review of KTUSA that “Company decisions are 100% done in korea [sic.].   Most documents in korean and no decision power, promotion system or training for non koreans.”   Docket 105-3 at pp. 1-2; <u>see also</u> Docket 105-4 at p. 2 (“Every decision must be finalized by Headquarters in Korea, which makes production slow.”).   But another anonymous employee wrote in 2013 that “There is an obviously segregated ‘team’ between various departments, Korean and American[.]”   (Docket 105-3 at p. 13).

The record is scarcer as to connections between KTV and KTCI or KTUSA. It appears employees have worked for both KTV and KTCI.   (Docket 50-11 at ¶¶ 2-3).   KTCI listed the KTV factory with other Kumho branded plants in its 2015 annual report.[9]   (Docket 48-5 at p. 8).   In that same report, KTCI noted it paid medical expenses for KTV employees who “get injured at [KTCI’s] production plant in a [sic.] Vietnam, . . . even send[ing] them to Korea for rehabilitation, if

---

[8]The Zurich plaintiffs falsely attribute this statement to KTCI.   (Docket 89 at p. 10).   It is a reporter’s description, not a quote from a KTCI or KTUSA representative.   However, KTUSA described itself as “the American distribution arm of [KTCI]” in a 2012 California state appellate brief.   Resp’t. Br., <u>Ahn v. Kumho Tire U.S.A., Inc.</u>, No. E054322, 2012 WL 1063248 at *6 (Cal. Ct. App. 4th, March 7, 2012).

[9]The Zurich plaintiffs contend KTCI “has total control over when and how to utilize its wholly-owned subsidiaries[,]” pointing to a passage in its 2018 annual report describing “reducing production volume and reducing the number of employees” at its factories in China.   (Docket 46 at p. 4) (citing Docket 48-8 at p. 2).   The record does not disclose KTCI’s relationship to any Chinese subsidiary or whether it is analogous to the relationship between KTV or KTUSA and KTCI.   Without more, the court will not accept the Zurich plaintiffs’ factual assertion that KTCI has total control over KTV and KTUSA.

necessary." Id. at p. 10.   KTCI opened a Korean language school in Vietnam. Id.   In 2012 and 2013, KTUSA issued recalls for tires manufactured by KTV. (Docket 50-10).

## II.   KTCI Motion to Dismiss

The court begins its analysis with KTCI's motion to dismiss for lack of personal jurisdiction.   In their objections to the R&R, the Zurich plaintiffs allege KTCI is properly subject to this court's personal jurisdiction because it has sufficient specific contacts with South Dakota and because KTUSA's specific contacts with South Dakota can be imputed to it.   (Docket 104 at pp. 21-38). They also argue the magistrate judge erred in finding their product liability claims were blocked by South Dakota's statute of limitations.   Id. at pp. 8-21.

The court first finds KTCI has no contacts with South Dakota sufficient to enable a direct exercise of personal jurisdiction and rejects the Zurich plaintiffs' distribution stream-of-commerce theory of personal jurisdiction.   However, the court concludes the Zurich plaintiffs are entitled to jurisdictional discovery on their alter ego theory.   In the interest of judicial economy, the court also rejects the Zurich plaintiffs' jurisdictional argument premised on a violation of the Magnuson-Moss Warranty Act, even though they did not raise it in their objections.   Finally, the court concludes KTCI's statute of limitations argument is dependent on further factfinding as to the relationship between KTCI and KTUSA.   The court sustains the Zurich plaintiffs' objections in part and overrules them in part.

11

### A.    KTCI specific personal jurisdiction

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to challenge a

federal court's personal jurisdiction over it.

> Personal jurisdiction can be specific or general.   Specific
> jurisdiction refers to jurisdiction over causes of action arising from
> or related to a defendant's actions within the forum state, while
> general jurisdiction refers to the power of a state to adjudicate any
> cause of action involving a particular defendant, regardless of where
> the cause of action arose.

Viasystems, Inc. v. EMB-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 593

(8th Cir. 2011) (internal quotations and alterations omitted).   The Zurich

plaintiffs bear the burden to "make a prima facie showing of [personal]

jurisdiction."   Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 647 (8th Cir.

2003).

"Federal courts apply the long-arm statute of the forum state to determine

the existence of personal jurisdiction over the parties."   Whaley v. Esebag, 946

F.3d 447, 451 (8th Cir. 2020).   Because South Dakota's long-arm statute

authorizes personal jurisdiction to the maximum extent permitted by the federal

constitution, SDCL § 15-7-2(14), the question is whether KTCI has sufficient

"minimum contacts" with South Dakota "so that traditional notions of fair play

and substantial justice" embedded in the Due Process Clauses of the Fifth and

Fourteenth Amendments "are not offended."   Whaley, 946 F.3d at 451 (internal

quotations omitted).

> [T]o evaluate whether [KTCI's] contacts are sufficient, five factors are
> relevant: (1) the nature and quality of [KTCI's] contacts with the
> forum state; (2) the quantity of [KTCI's] contacts; (3) the relationship

of the cause of action to [KTCI's] contacts; (4) the interest of [South Dakota] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties.

Pederson, 951 F.3d at 980 (internal quotation omitted).   "The fourth and fifth factors carry less weight and are not dispositive."   Whaley, 946 F.3d at 452 (internal quotation omitted).

The Zurich plaintiffs have not shown KTCI has the necessary minimal contacts with South Dakota.   In their objections, they raise two purported contacts: KTCI's alleged sponsorship of a Sioux Falls basketball team and a feature on KTCI's website directing tire purchasers to the closest authorized vendor.   (Docket 104 at pp. 23-24).   These contacts are insufficient.

First, the Zurich plaintiffs allege KTCI purposefully advertises in a Sioux Falls basketball arena.   For purposes of the motion to dismiss, the court assumes KTCI—and not KTUSA, as KTCI argues—purchased the advertisement. Looking to the first and second factors, the court finds purchasing a single advertisement in South Dakota is minimal in terms of nature, quality and quantity.   And as for the third factor, the Zurich plaintiffs do not assert the purchase has any relationship at all to the product liability claims at issue here.[10]   The fourth and fifth factors are immaterial where, as here, the first

---

[10]For the same reason, the Zurich plaintiffs' argument that "KTCI's advertising within the State is more than sufficient to trigger South Dakota's long-arm statute" fails.   (Docket 104 at p. 23).   The long-arm statute only permits a court to premise personal jurisdiction on a contract for goods or services where the cause of action "aris[es] from the doing personally" of the act of entering into a contract.   SDCL § 15-7-2.   This is the basic premise of specific jurisdiction.

13

through third factors overwhelmingly weigh against exercising specific jurisdiction.

The Zurich plaintiffs' second purported contact likewise fails to establish specific jurisdiction.   KTCI maintains a website (which loads initially in Korean, the court notes) from which consumers can navigate to a function showing nearby authorized Kumho vendors.[11]   The Zurich plaintiffs describe the website as "in-state advertising" and "interactive website distribution channels" but there is no evidence the website is hosted in South Dakota or otherwise targeted at South Dakota.   Id. at p. 24.   If maintaining a universally accessible website can even be characterized as a specific contact with South Dakota, it is among the most minimal contacts imaginable.   The mere fact that the website directs interested consumers to South Dakota vendors is not enough to support personal jurisdiction.   See Regenexx, LLC v. Regenex Health LLC, No. 19-cv-119, 2020 WL 1269790 at *6 (S.D. Iowa Mar. 17, 2020) (rejecting personal jurisdiction "where a visitor to a website can enter his or her information" to be connected to vendor).   And again, the Zurich plaintiffs do not argue the website has any connection with its product liability claims.   The first three factors cannot support an exercise of specific jurisdiction, so the court need not consider the fourth and fifth factors.

---

[11]Available at https://www.kumhotire.com/ (Last visited July 28, 2020). The court assumes this website may be attributed to KTCI, although KTCI argues it "provides a means for commercial contacts with KTUSA, not KTCI."   (Docket 112 at p. 3).

The Zurich plaintiffs failed to show the court has specific personal jurisdiction over KTCI directly.   They do not assert the court has general personal jurisdiction.   (Docket 89 at p. 14).   The court next turns to whether its uncontested personal jurisdiction over KTUSA can be imputed to KTCI.[12]

### B.     Imputed jurisdiction theories

In their objections, the Zurich plaintiffs raise two distinct theories of personal jurisdiction over KTCI dependent on a relationship between KTCI and KTUSA.   They first contend KTUSA is KTCI's corporate alter ego and that the court's personal jurisdiction over KTUSA should extend to KTCI.   (Docket 104 at pp. 24-31).   Their second contention, relying on precedent from the United States Court of Appeals from the Eighth Circuit, argues KTCI is subject to specific jurisdiction based on a variety of the controversial stream-of-commerce theory.   Id. at pp. 36-38.   Under this theory, the Zurich plaintiffs ask the court to find specific jurisdiction based on KTCI's alleged targeting of South Dakota by "pour[ing] its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area."   Viasystems, 646 F.3d at 597 (internal quotations omitted).

_____

[12]Under Federal Rules of Civil Procedure 12(b) & 12(h)(1)(B)(i), KTUSA waived its right to contest personal jurisdiction by failing to raise it in a motion to dismiss before answering the complaint.   The court is aware "federal courts have allowed untimely motions if the defense has been previously included in the answer[,]" as it was here.   Arthur R. Miller et al., Fed. Practice & Procedure § 1361 (3d. ed. Apr. 2020 update) (collecting cases); see also Docket 26 at p. 9 (raising lack of personal jurisdiction as defense in KTUSA's answer).   But given that the motion practice in this case has focused on personal jurisdiction for months without any attempt by KTUSA to join those motions, the court sees no inequity in enforcing the waiver rule.

15

The court first rejects the distribution stream-of-commerce jurisdiction theory.   However, the court concludes there are insufficient facts to determine whether KTUSA is KTCI's corporate alter ego.   The court finds limited jurisdictional discovery is necessary on the Zurich plaintiffs' alter ego theory.

### 1.    Distribution stream-of-commerce jurisdiction

In the Eighth Circuit, where "a foreign manufacturer 'pour[s] its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area, the manufacturer has purposefully reaped the benefits of the laws of each State in that trade area for due process purposes[,]" enabling—although not commanding—the exercise of personal jurisdiction. Vandelune v. 4B Elevator Components Unlimited, 148 F.3d 943, 948 (8th Cir. 1998) (quoting Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 615 (8th Cir. 1994)).   "Personal jurisdiction may be found where a seller uses a distribution network to deliver its products into the stream of commerce with the expectation that the products will be purchased by consumers in the forum state."   Stanton v. St. Jude Med., Inc., 340 F.3d 690, 694 (8th Cir. 2003).

However, "the mere 'placement of a product into the stream of commerce, without more, does not constitute an act of the defendant purposefully directed toward the forum State[.]' "   Viasystems, 646 F.3d at 597 (quoting Falkirk Mining Co. v. Japan Steel Works, 906 F.2d 369, 376 (8th Cir. 1990)).   "[A] manufacturer whose product ends up in the forum State on an attenuated, random, or fortuitous basis has not purposefully directed its activities at

16

residents of that State."   Vandelune, 148 F.3d at 948 (internal quotation

omitted).   And "minimum contact analysis does not permit contact with a

market to substitute for contact with a forum."   Soo Line R. Co. v. Hawker

Siddeley Canada, Inc., 950 F.2d 526, 529 (8th Cir. 1991).   A court should not

"equate[] purposeful availment of the opportunity to enter a market with

purposeful availment of a forum state's benefits and protections."   Id.

     The Southern Division of this court has described the Eighth Circuit's

distribution stream-of-commerce jurisdiction theory as "an overlay through

which" the five-factor personal jurisdiction test "may be viewed."   Estate of

Moore v. Carroll, 159 F. Supp. 3d 1002, 1012 (D.S.D. 2016).   "Thus, while the

Eighth Circuit's 'stream of commerce' variant does not supplant the factors, it

can augment the analysis."   Id.   The court follows this approach.

     The court concludes exercising personal jurisdiction over KTCI through its

alleged distribution of tires into the South Dakota market is inconsistent with

due process.   The record before the court does not show KTCI and KTUSA

intended to distribute tires specifically in South Dakota.   Rather, they intended

to sell tires throughout the United States and, indeed, the world.   Their

distribution contacts with South Dakota are simply too attenuated to support

the exercise of personal jurisdiction.   See J. McIntyre Mach., Ltd. v. Nicastro,

564 U.S. 873, 882 (2011) (plurality opinion) ("[A]s a general rule, it is not enough

that the defendant might have predicted that its goods will reach the forum

State.").

Aside from the photograph of the Kumho brand on a Sioux Falls basketball arena and KTCI's website, which do not support personal jurisdiction for the reasons stated above, see supra Section II.A, the only record evidence tying KTCI or KTUSA to South Dakota are the documents suggesting KTUSA regional sales managers have been assigned to South Dakota.   This evidence shows only that KTUSA intended to facilitate the sale of Kumho tires through independent retailers in South Dakota.   There is no allegation that KTUSA's regional managers are based in South Dakota, maintain offices in South Dakota, or directly sell tires to South Dakotans.   Instead, KTUSA registers South Dakota vendors, who appear to independently order and sell Kumho tires through KTUSA's distribution system.   Under these circumstances, the most the court can find is that KTUSA has contacts with the South Dakota tire market.   This is not enough; the Zurich plaintiffs must show KTUSA maintained contacts with South Dakota as a forum, not simply as a market.   Soo Line, 950 F.2d at 529.

A comparison of this case with cases where the Eighth Circuit has endorsed personal jurisdiction under a distribution stream-of-commerce theory is illuminating.   In Barone, for example, an average of 70 percent of a Japanese firework manufacturer's business was with American distributors.   25 F.3d at 611.   One distributor was based in South Dakota.   Id.   The South Dakota distributor sold 16 percent of the Japanese fireworks to Nebraskans, including the plaintiff.   Id.   The Japanese company also provided the South Dakota distributor with "price lists, purchase terms, and shipping information[.]"   Id. at

18

612.   The Eighth Circuit found these facts sufficient to establish personal jurisdiction.   Id. at 615.

In Vandelune, a British company manufactured an allegedly defective sensor designed to prevent grain dust explosions.   148 F.3d at 944.   The sensor passed through a British distributor to an Illinois distributor to an Iowa vendor to a grain elevator which employed the plaintiff.   Id.   The manufacturer designed the sensor for the American market and directed it to the Illinois distributor.   Id. at 948.   Eighty-one of the Illinois' distributor's 619 sensors ended up in Iowa.   Id.   The Eighth Circuit held the British manufacturer's contacts with Iowa were not "attenuated, random, or fortuitous[.]"   Id.

In Clune v. Alimak AB, a Swedish manufacturer built construction hoists. 233 F.3d 538, 540 (8th Cir. 2000).   American distributors sold approximately 700 hoists, including 20 to 40 in Missouri.   Id. at 541.   The Eighth Circuit held the manufacturer "purposefully directed its products to the United States through the distribution system it set up in this country" and that it "knew that by virtue of this system, its construction hoists entered the Missouri and other Midwest markets."   Id. at 545.

These cases each involved a relatively large proportion of a manufacturer's total product entering a specific state through a distribution system.   In each case, the fact that the foreign manufacturer built a domestic distribution system combined with evidence that a large percent of imported product was distributed in a specific state established personal jurisdiction on a distribution

19

stream-of-commerce theory.   <u>Barone</u>, 25 F.3d at 613-15; <u>Vandelune</u>, 148 F.3d at 948; <u>Clune</u>, 233 F.3d at 543-44.

Here, KTUSA distributes KTCI's tires in the United States through sales to a network of independent American vendors.   But nothing in the record shows that a large proportion of KTCI's tires were directed to or sold in South Dakota. The magistrate judge found approximately .00034 percent of KTCI's North America tire sales were in South Dakota, assuming an even per capita distribution of sales.[13]   (Docket 102 at pp. 47-48).   If this minimal percentage is enough for the court to infer that KTCI specifically intended to contact South Dakota as a forum through KTUSA's tire distribution system, then KTCI is surely subject to personal jurisdiction in every state in the Union based on nothing more than the presence of its tire in a forum state.   That cannot be the correct outcome.   <u>See</u> <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 296 (1980) (rejecting rule where defendant's "amenability to suit would travel with the chattel.").

Indeed, the Zurich plaintiffs' theory strongly resembles the theory of personal jurisdiction the Supreme Court disapproved in <u>J. McIntyre</u>.   There, the New Jersey Supreme Court validated personal jurisdiction over a manufacturer whose "products [were] distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states[.]"   <u>J. McIntyre</u>, 564 U.S. at 879.   Six Justices rejected New Jersey's rule, four in a

---

[13]The Zurich plaintiffs did not object to this finding.

plurality opinion and two in concurrence.   Id. at 879, 886, 888, 891.   Here, the

Zurich plaintiffs ask the court to exercise jurisdiction over KTCI because an

extremely small percentage of its tires may be sold in South Dakota through

KTUSA's national distribution network.   A majority of the Supreme Court

rejected this theory in J. McIntyre.   The court is not at liberty to resurrect it.

The Eighth Circuit's five-factor test likewise does not support personal

jurisdiction over KTCI based on KTUSA's tire distribution.   See Pederson, 951

F.3d at 980 (internal quotation omitted).   The third factor weighs in favor of

jurisdiction because the product liability claims at issue here arose out of the

distribution of the allegedly defective tire to South Dakota.   But KTCI's

distribution-based contacts with South Dakota are simply too minimal to

support jurisdiction.   Only a small fraction of KTCI's North American tire sales

occurred in South Dakota—and even those sales were not directly made by KTCI

or KTUSA, but instead through independent retailers.   The first and second

factors do not weigh in favor of personal jurisdiction.

The magistrate judge found the fourth factor weighed in favor of

jurisdiction because South Dakota has a strong interest in providing a forum for

its citizens.[14]   (Docket 102 at p. 48).   She also found the fifth factor was a wash.

Id.   While the Zurich plaintiffs may find this court a convenient forum, it would

likely inconvenience KTCI.   Id.

---

[14]The Zurich plaintiffs do not object to the magistrate judge's evaluation of
these factors and the court adopts it.

KTCI's minimal distribution-based contacts with South Dakota are insufficient to support personal jurisdiction both under the Eighth Circuit's distribution stream-of-commerce test and its five-factor test.   The court affirms the magistrate judge's rejection of this theory of personal jurisdiction.

### 2.    Corporate alter ego

Having rejected the Zurich plaintiffs' distribution stream-of-commerce theory of personal jurisdiction, the court now turns to the "conceptually separate . . . question whether a subsidiary's contacts with the forum state should be attributed to a foreign parent corporation" under an alter ego theory. Viasystems, 646 F.3d at 596.   "[W]hen the defendant is a nonresident parent corporation[,] . . . . personal jurisdiction can be based on the activities of the nonresident corporation's in-state subsidiary, but only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego."[15]   Epps, 327 F.3d at 648-49. In this situation, "the subsidiary's contacts are those of the parent corporation's, and due process is satisfied."   Id. at 649.   However, "[a] corporation is not doing business in a state merely by the presence of its wholly owned subsidiary."   Id.

---

[15]Like the magistrate judge, the court will assume the Zurich plaintiffs can establish alter ego jurisdiction by proving the necessary links between KTCI and KTUSA, even though they do not attempt to prove general jurisdiction over KTUSA.   Docket 102 at p. 64; but see Epps, 327 F.3d at 650 (examining whether "general personal jurisdiction [over subsidiary] exists through an alter-ego approach" after finding no specific jurisdiction over parent company) (emphasis added).

22

(quoting <u>Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt.</u>, 519 F.2d 634, 637 (8th Cir. 1975)).   "[A] court's assertion of [alter ego] jurisdiction is contingent on the ability of the plaintiffs to pierce the corporate veil.   State law is viewed to determine whether and how to pierce the corporate veil."   <u>Id.</u>

In South Dakota, "[a] parent corporation is liable for the acts of its subsidiary . . . when (1) the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former; and (2) adherence to the rule of corporate separateness would produce injustices and inequities."[16] <u>Glanzer v. St. Joseph Indian Sch.</u>, 438 N.W.2d 204, 207 (S.D. 1989).   In <u>Glanzer</u>, the South Dakota Supreme Court recognized 11 factors "which indicate the degree of control necessary to hold the parent liable:

> (a)   The parent corporation owns all or most of the capital stock of the subsidiary.
>
> (b)   The parent and subsidiary corporations have common directors or officers.
>
> (c)   The parent corporation finances the subsidiary.
>
> (d)   The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.
>
> (e)   The subsidiary has grossly inadequate capital.
>
> (f)   The parent corporation pays the salaries and other expenses or losses of the subsidiary.

---

[16]In South Dakota, a parent company is also its subsidiary's alter ego "when an agency relationship exists between them[,]" but the Zurich plaintiffs do not allege an agency relationship between KTCI and KTUSA.   <u>Glanzer</u>, 438 N.W.2d at 207.   Moreover, the Eighth Circuit has rejected an "agency theory of jurisdiction[.]"   <u>Viasystems</u>, 646 F.3d at 596.

(g)     The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(h)     In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(i)     The parent corporation uses the property of the subsidiary as its own.

(j)     The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(k)     The formal legal requirements of the subsidiary are not observed."

Id. at 207.   These factors are not "exhaustive" and all "need not be present for the trier of fact to conclude that the subsidiary is a mere instrumentality of its parent."   Id.   The second prong of the test—whether adhering to corporate formalities "would produce injustices and inequitable consequences"—is satisfied "where the wrong alleged is a result of fraudulent, unjust or illegal acts." Id.

In determining whether to pierce the corporate veil, the court is mindful of the "general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."   United States v. Bestfoods, 524 U.S. 51, 61 (1998) (internal quotation omitted).   "A parent corporation is generally not liable for . . . its subsidiaries, and the doctrine of piercing the fiction of corporate identity should

24

be applied with great caution." Robinson v. Terex Corp., 439 F.3d 465, 468 (8th Cir. 2006) (citing Epps, 327 F.3d at 649). South Dakota also approaches veil piercing with caution. Osloond v. Osloond, 609 N.W.2d 118, 121 (S.D. 2000).

The magistrate judge rejected the Zurich plaintiffs' alter ego theory. (Docket 102 at pp. 66-67). She presumed KTUSA did not have any business except that directed to it by KTCI. Id. at p. 66. However, she ultimately concluded KTUSA was not undercapitalized or a dummy corporation, as generally required under Glazner. Id. In their objections, the Zurich plaintiffs point to their description of KTCI's finances, the fact that KTCI owns KTUSA, the lack of evidence of arm's length transactions and online reports from anonymous KTUSA employees. (Docket 104 at pp. 26-27).

Some aspects of the record weigh in favor of piercing the corporate veil under Glazner. 438 N.W.2d at 207. It is true KTCI wholly owns KTUSA.[17] KTCI sometimes refers to KTUSA as its arm or as part of its own business, satisfying another Glazner factor. KTUSA admitted KTCI financed the Georgia manufacturing plant, which is likely one of KTUSA's most substantial assets.

But the Zurich plaintiffs have not established that KTUSA is undercapitalized. As noted above, see supra Section I, the record does not support the significant losses they assert KTCI suffered. Nor can the court draw

---

[17]The Zurich plaintiffs complain that KTUSA has not responded to discovery concerning common corporate directors or officers with KTCI. (Docket 104 at p. 26). Mr. Kim, KTCI's quality director, stated in his affidavit that KTCI and KTUSA do not have any common directors. (Docket 80-5 at ¶ 34). The Zurich plaintiffs may test this assertion through the limited jurisdictional discovery the court permits below. See infra Section II.B.3.

any inferences from the fact that an external auditor used or did not use a certain type of accounting technique to properly value KTUSA's worth.   And the Zurich plaintiffs' attempt to show KTCI injected cash into KTUSA falls flat—the record shows only that KTCI capitalized its subsidiaries as a whole.   The court cannot tell if KTCI specifically capitalizes KTUSA.

Nor is the court persuaded that KTCI and KTUSA do not operate at arm's length with each other.   For one thing, the distribution agreement between the two companies explicitly contemplates their independent operation.   (Docket 112-2 at p. 5).   KTCI agreed not to set tire prices so as to undermine KTUSA's profitability.[18]   Id.   The Zurich plaintiffs argue KTUSA does not purchase tires with the contracts and inspections one might expect from corporations operating independently of one another.   (Docket 104 at pp. 30-31).   But the record shows only that KTUSA denied having responsive documents in relation to requests for information about tire quality control or for bills of lading.   This is hardly the wholesale admission that the Zurich plaintiffs would like it to be. And it would not be unusually suspect for a subsidiary of a global tire company to have standardized purchasing arrangements that do not involve meticulous quality inspections of every tire as it comes off the factory line.

---

[18]The Zurich plaintiffs argue this provision of the agreement is so favorable to KTUSA as to prove it is KTCI's alter ego.   (Docket 119 at pp. 3-4).   The court views the provision as KTCI attempting to avoid market distortions that might naturally arise between a subsidiary and its parent company.   The provision shows the parties were concerned about maintaining some measure of financial separateness.   It weighs against the Zurich plaintiffs' alter ego theory.

Finally, even viewing the record in the light most favorable to the Zurich plaintiffs, the court can put no stock in their proffered employee reviews. These reviews are anonymous. The Zurich plaintiffs have not authenticated them, nor have they shown the reviewers are not influenced by other factors, such as job dissatisfaction or anti-Asian bias. Moreover, the reviews did not speak with one voice. One reviewer noted that the American and Korean departments were "segregated[,]" implying separation of the two companies. (Docket 105-3 at p. 13).

This court noted in a prior case that the <u>Glazner</u> factors are designed to test whether "the subsidiary is a dummy or a sham corporation or undercapitalized." <u>Van Dusseldorp v. Cont'l. Cas. Co.</u>, CIV. 16-05073, 2017 WL 4004421, at *7 (D.S.D. Sept. 11, 2017) (internal quotation omitted). The Eighth Circuit's inquiry asks whether "the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego." <u>Epps</u>, 327 F.3d at 648-49. The present record meets neither test. It is clear that KTCI and KTUSA are connected in important ways, but the Zurich plaintiffs made no showing permitting a reasonable inference that KTUSA is an undercapitalized puppet so controlled by KTCI that it has lost its own corporate existence. The court affirms the magistrate judge's rejection of the Zurich plaintiffs' alter ego findings.

### 3.   Jurisdictional discovery

The court's finding that the present record does not support personal jurisdiction over KTCI on a corporate alter ego theory does not end the analysis. The Zurich plaintiffs object to the magistrate judge's refusal to permit jurisdictional discovery.   (Docket 104 at pp. 33-36).   They are entitled to jurisdictional discovery if relevant facts are unknown or disputed.   Viasystems, 646 F.3d at 598.   Having rejected many of the Zurich plaintiffs' misleading characterizations of the present record, the court finds no factual disputes that would be resolved by jurisdictional discovery.   But many relevant facts remain unknown.[19]

The court agrees with the magistrate judge that the Zurich plaintiffs' proposed jurisdictional discovery wish list is little more than a fishing expedition. See Docket 91 (requesting information about KTCI's insurers, U.S. dealers, "knowledge of the U.S. market . . . generally[,]" etc.).   The court also finds that the Zurich plaintiffs' case for jurisdictional discovery over KTCI's contacts with South Dakota is wholly speculative.   See Viasystems, 646 F.3d at 598 (rejecting

---

[19]Relying on nonbinding precedent, the Zurich plaintiffs also assert the court should save the veil piercing inquiry for jury determination at trial. (Docket 104 at p. 32).   This is an odd request from a party whose theory of personal jurisdiction depends on piercing the corporate veil.   The fact intensive nature of the veil piercing inquiry—which in cases of alleged corporate malfeasance is usually submitted to a jury as a merits question—raises a significant problem when it is part of a jurisdictional analysis.   Indeed, each case the Zurich plaintiffs cite for their proposed rule concern the merits of a substantive claim, not personal jurisdiction.   To subject KTCI to the burdens of trial simply to determine whether personal jurisdiction exists would be an unfair imposition on KTCI and potentially a gross waste of judicial resources.   The court is loath to take that path unless absolutely necessary.

jurisdictional discovery request based on speculation).   The most the Zurich plaintiffs offered in their objections to show KTCI's direct links to South Dakota are a website and a basketball advertisement of unknown provenance.   There is no cause to permit further inquiry on that front.

However, the record does not shed much light on KTUSA's financial relationship with KTCI.   This is perhaps the main fact the <u>Glazner</u> factors aim to ferret out—whether the subsidiary is an undercapitalized dummy corporation—and it would be particularly relevant here, where the court must determine if KTUSA is a puppet of KTCI.   Whether KTUSA has business separate from KTCI or has independent control of its own business decisions is relevant as well.   Does KTUSA require KTCI's approval before entering into marketing or other contracts in the United States?   If KTCI must sign off on every significant business decision KTUSA makes, the Zurich plaintiffs' case for alter ego personal jurisdiction would be stronger.   Conversely, if KTCI's control over KTUSA is limited to merely reaping profits, the case would be weaker.

The court will permit the Zurich plaintiffs 90 days to investigate the matters in the preceding paragraph through discovery from KTCI.[20]   They are reminded the court has an obligation not to subject KTCI to unnecessarily

---

[20]The court is aware of the difficulties for discovery posed by the ongoing COVID-19 pandemic.   However, the parties are warned the court will not extend this deadline merely to facilitate the in-person deposition of KTCI employees residing in South Korea or elsewhere.   The parties are urged to complete jurisdictional discovery via document production if at all possible.   And if depositions are necessary, they should be conducted virtually.

burdensome discovery while the question of its personal jurisdiction is unsettled.

The court notes the magistrate judge recently issued an order on a motion to compel filed by the Zurich plaintiffs.   (Docket 126).   She denied as irrelevant the Zurich plaintiffs' request for jurisdictional discovery, reasoning her conclusion that their claims were barred by South Dakota's statute of limitations mooted the personal jurisdiction issue.   Id. at pp. 7-9.   The court rejects the magistrate judge's statute of limitations findings below.   See infra Section II.D. Accordingly, the magistrate judge is directed to reconsider her order on the motion to compel in light of the court's finding that jurisdictional discovery is necessary.   The magistrate judge should permit jurisdictional discovery as described in this order.   See 28 U.S.C. § 636(b)(1) (district court "may . . . recommit [a] matter to the magistrate judge with instructions.").

The court sustains the Zurich plaintiffs' objection as to jurisdictional discovery and rejects the magistrate judge's contrary conclusion.

**C.      Magnuson-Moss Warranty Act**

The Zurich plaintiffs argued personal jurisdiction existed over KTCI based on its Magnuson-Moss Warranty Act ("MMWA") claims before the magistrate judge.   (Docket 89 at pp. 25-30).   The magistrate judge found they failed to show their MMWA claims met the Act's amount-in-controversy requirement but permitted the claims to proceed as a supplement to their state law product liability claims.   (Docket 102 at pp. 24-41).   The Zurich plaintiffs waived any

challenge to these conclusions by failing to object to them.   Thomas v. Arn, 474 U.S. 140, 150 (1985) (Federal Magistrates Act does not "require district court review of a magistrate's legal or factual conclusions . . . when neither party objects to those findings[.]").

The court writes on this matter only to forestall the return of this theory as to KTCI in a future motion, should the Zurich plaintiffs be unable to establish personal jurisdiction through an alter ego theory.   The Zurich plaintiffs argued KTCI has sufficient minimal contacts with the United States as a whole and is therefore subject to personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), "a species of federal long-arm statute."   United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 40 (1st Cir. 1999).   But this argument overlooks Rule 4(k)(2)'s requirement that the claim "arise[] under federal law[.]"   Fed. R. Civ. P. 4(k)(2); see also Swiss Am. Bank, 191 F.3d at 42-45 (discussing requirement).

As explained below, the court agrees with the magistrate judge's finding that the Zurich plaintiffs cannot plausibly allege more than $50,000 in damages on their MMWA claims.   See infra Section III.A.   The $50,000 limit is jurisdictional in nature.   15 U.S.C. § 2310(d)(3)(B).   Because the Zurich plaintiffs cannot meet the amount-in-controversy requirement, their claim arises under state instead of federal law.   Id. at § 2310(d)(1)(A).   Their attempt to establish personal jurisdiction under Rule 4(k)(2) fails.

31

### D.     Statute of Limitations

Pursuant to Rule 12(b)(6), the magistrate judge concluded the Zurich plaintiffs filed their complaint outside the three-year statute of limitations for product liability actions in South Dakota.[21]   (Docket 102 at pp. 8-24).   They filed their original complaint in this court on June 17, 2019, five days before the statute of limitations elapsed.   Id. at p. 3.   It appears the Zurich plaintiffs timely served KTUSA or, at least, KTUSA does not contest service.   But in South Dakota, "[a]n action is commenced as to each defendant when the summons is served on him, or on a codefendant who is a joint contractor or *otherwise united in interest* with him."   SDCL § 15-2-30 (emphasis added).   The amended complaint was not served on KTCI until January 29, 2020, more than seven months after the statute of limitations expired.[22]   (Docket 102 at p. 3).   The fighting question is thus whether KTCI and KTUSA are "united in interest." SDCL § 15-2-30.

Both the magistrate judge and the Zurich plaintiffs note there is little law interpreting the meaning of the phrase "united in interest."   (Dockets 102 at p. 18 & 104 at pp. 5-6).   Both the common meaning of the phrase and its association with the term joint contractor suggest it is not intended to require an association as stringent as is needed to be a corporate alter ego under South

---

[21]The parties agree the three-year statute of limitations governs the Zurich plaintiffs' MMWA claims.   (Dockets 103 & 111).   The court sustains KTCI's objection on this point.

[22]The Zurich plaintiffs do not contest these dates of service.   (Docket 104 at p. 10).

Dakota and Eighth Circuit law.   Whatever the exact nature of the necessary relationship, it is clear the factfinding the parties will undertake in jurisdictional discovery will aid in the court's analysis.   And, as the Zurich plaintiffs point out, a statute of limitations defense may not be resolved at the motion to dismiss stage unless the necessary facts are obvious from the face of the complaint. Ritchie Capital Mgmt., L.L.C. v. JP Morgan Chase & Co., 960 F.3d 1037, 1048 (8th Cir. 2020).

The court finds determining whether KTCI and KTUSA are united in interest for purposes of establishing a date of service would require factfinding that is inappropriate in the context of a Rule 12(b)(6) motion to dismiss.   If KTCI remains a defendant in this case, it may reassert its statute of limitations defense on summary judgment.[23]   The Zurich plaintiffs' objection is sustained and the magistrate judge's contrary conclusion is rejected.

### III.   KTV's Motion to Dismiss

The court next turns to KTV's motion to dismiss for lack of personal jurisdiction.   The magistrate judge found the court had no personal jurisdiction over KTV.   (Docket 67).   She held the court lacked specific personal jurisdiction over KTV either directly or through a distribution stream-of-commerce theory. Id. at pp. 14-31.   She also found the Zurich plaintiffs failed to show KTV was an

---

[23]The court expresses no opinion as to whether SDCL § 15-2-25, which tolls statutes of limitations "[w]hen the commencement of an action is stayed by injunction or statutory prohibition," applies where a plaintiff is required by law to use a mechanism for international service.   See Dockets 102 at pp. 22-24 & 104 at pp. 17-21 (debating question).   It is unnecessary to resolve this unsettled legal question in light of the need for additional factfinding.

alter ego of KTUSA, the only Kumho defendant which does not contest personal jurisdiction.   Id. at pp. 31-36.   Finally, she recommended rejecting the Zurich plaintiffs' attempt to establish personal jurisdiction over KTV through their MMWA claims.   Id. at pp. 8-14.   While she did not pass on the viability of the MMWA claims, she concluded this would be an appropriate case to decline jurisdiction as a matter of discretion.   Id.

The Zurich plaintiffs only raise their alter ego and MMWA theories of jurisdiction in their objections.   (Docket 68 at pp. 12-19, 20-27).   In the alternative, they ask for jurisdictional discovery.   Id. at pp. 19-20.   The court, relying on unobjected-to portions of the magistrate judge's R&R on KTCI's motion to dismiss, first concludes the Zurich plaintiffs' MMWA claims do not allege a sufficient amount-in-controversy to establish federal question jurisdiction.   However, the court finds the present record is insufficient to determine whether KTV is the alter ego of either KTUSA or KTCI such that it may be subject to this court's personal jurisdiction.   The court permits the Zurich plaintiffs to undertake limited jurisdictional discovery.

### A.   MMWA claims

"The MMWA grants the holder of a[n] [implied] warranty a federal cause of action for a breach of warranty under the applicable state law."   Sipe v. Workhorse Custom Chassis, LLC, 572 F.3d 525, 530 (8th Cir. 2009); see also 15 U.S.C. § 2310(d)(1).   Federal courts do not have jurisdiction over MMWA claims "if the amount in controversy is less than . . . $50,000 (exclusive of

34

interests and costs) computed on the basis of all claims to be determined in this suit[.]"   15 U.S.C.   § 2310(d)(3)(B).   Here, KTV asserts the amount in controversy cannot reach $50,000.   (Docket 64 at pp. 6-7).   This attack requires the Zurich plaintiffs to "establish jurisdiction by a preponderance of the evidence."   Am. Family Mut. Ins. Co. v. Vein Ctrs. for Excellence, Inc., 912 F.3d 1076, 1080 (8th Cir. 2019) (internal quotation omitted).   The court must determine whether it "appears to a legal certainty" that the Zurich plaintiffs cannot prove the jurisdictional amount.   Id. (internal quotation and alteration omitted).

Whether the Zurich plaintiffs can prove the jurisdictional amount is relevant because they assert personal jurisdiction exists over KTV under Rule 4(k)(2), the so-called federal long-arm statute.   (Docket 68 at pp. 20-27).   Rule 4(k)(2) authorizes personal jurisdiction in a federal court if the claim "arises under federal law[.]"   Fed. R. Civ. P. 4(k)(2).   While a MMWA claim undoubtedly arises under federal law if the amount-in-controversy requirement is met, such claims are otherwise cognizable "in any court of competent jurisdiction in any State[.]" 15 U.S.C. § 2310(d)(1)(A).

Because a state forum is always available for an MMWA claim, the court does not agree with those courts which have declined to engage in a merits analysis to determine if a claim arises under federal law for Rule 4(k)(2) purposes.   See Nuevos Destinos, LLC v. Peck, No. 19-cv-45, 2019 WL 6481441 at *9 (D.N.D. Dec. 2, 2019); Archangel Diamond Corp. Liquidating Trust v. OAO

Lukoil, 75 F. Supp. 3d 1343, 1361-62 (D. Colo 2014).[24]   The court instead
follows the First Circuit, which looks to "the strength of the relevant federal
interest."   Swiss Am. Bank, 191 F.3d at 44.   Congress made clear in the MMWA
that the federal interest in enforcing a consumer's warranty protections is
dependent on the value of the consumer's claim.   The amount in controversy
determines whether federal jurisdiction is even available over an MMWA claim.
15 U.S.C. §§ 2310(d)(1), (3)(B).   Congress further adopted state law to govern
MMWA claims.   Sipe, 572 F.3d at 530; see also Swiss Am. Bank, 191 F.3d at 45
("[T]he salient consideration is not whether state law has the capacity adequately
to protect the federal interest, but, rather, whether the ascertained federal
interest necessitates a federal source for the rule of decision.").   The court finds
the question of whether the claim arises under federal or state law must be
answered with reference to the amount in controversy.

The Zurich plaintiffs briefly argue in their objections to the KTV R&R that
the amount they have paid in workers' compensation benefits for Mr. Hawk Wing
is sufficient to meet the MMWA amount-in-controversy requirement.   (Docket
68 at p. 24).   But the magistrate judge persuasively rejected this argument in
her R&R on the KTCI motion to dismiss, where she described the substantial
authority weighing against recovery of personal injury damages in an MMWA

---

[24]These cases did not concern the MMWA.

claim.[25]   Docket 102 at pp. 32-38; see also Kelly v. Fleetwood Enters., Inc., 377 F.3d 1034, 1038-39 (9th Cir. 2004); Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 525 (7th Cir. 2003); Boelens v. Redman Homes, Inc., 748 F.2d 1058, 1061-68 (5th Cir. 1984).   The Zurich plaintiffs did not object to this conclusion in response to the KTCI R&R and the court applies it here, in the context of KTV's motion to dismiss.

The question is thus whether the Zurich plaintiffs can show the amount in controversy from the alleged warranty breaches could exceed $50,000 without counting personal injury damages.   The only non-personal injury damages in this case are Heavy's losses related to damage to the truck, which total $8,322.68.[26]   (Dockets 80 at p. 22 & 89 at p. 33).   Given the limitations on the amount of damages recoverable in an MMWA action, the court finds to a legal certainty that the Zurich plaintiffs cannot plausibly allege the amount in controversy exceeds $50,000.   Their MMWA claims cannot serve as an independent source of federal subject-matter jurisdiction and, consequently, cannot enable the exercise of personal jurisdiction under Rule 4(k)(2).

However, the court agrees with the magistrate judge that the court retains jurisdiction over the MMWA claims as a supplement to the state law product

---

[25]The magistrate judge also rejected the Zurich plaintiffs' attempt to count punitive damages or attorneys' fees toward the amount-in-controversy requirement.   (Docket 102 at pp. 29-31).   The court adopts her analysis.

[26]The Zurich plaintiffs argued funeral and burial expenses are not personal injury damages, but these costs would not have arisen in the absence of injury.   (Docket 89 at p. 33 n.12).

liability claims.   (Docket 102 at pp. 39-41).   The court does not dismiss the MMWA claims.   The court overrules the Zurich plaintiffs' objection as to the viability of the MMWA claims as a source of personal jurisdiction.   (Docket 68 at pp. 20-27).

### B.    Alter ego

The Zurich plaintiffs objected to the magistrate judge's rejection of their alter ego theory of personal jurisdiction.   (Docket 68 at pp. 12-19).   The relevant law is set forth above.   See supra Sections II.C.2 & 3.   However, the Zurich plaintiffs argue the Eighth Circuit created "a lesser, flexible standard than alter ego" in Anderson v. Dassault Aviation, 361 F.3d 449 (8th Cir. 2004). (Docket 68 at pp. 15-17).   They overread Anderson.   That case found a French jet manufacturer was subject to personal jurisdiction in Arkansas because its wholly owned subsidiary operated a "large production site in Little Rock[.]" Anderson, 361 F.3d at 451-53.   Because of the subsidiary's Arkansas plant and connections between the subsidiary and manufacturer, the Eighth Circuit held the plaintiff did not need to prove the manufacturer's "physical presence in Arkansas" or pierce the subsidiary's corporate veil.   Id. at 452-53.   Anderson merely stands for the unremarkable principle that the personal jurisdiction inquiry "always involves applying principles of fairness and reasonableness to a distinct set of facts" and "is not readily amenable to rigid rules that can be applied across the entire spectrum of cases."   Id. at 452.   As the magistrate

38

judge noted, none of the Kumho entities maintain a presence in South Dakota remotely equivalent to the production site in <u>Anderson</u>.   (Docket 67 at p. 36).

In <u>Viasystems</u>, the Eighth Circuit recognized "a lesser relationship between the two corporations remains a relevant factor in determining whether the foreign corporation" may be subject to personal jurisdiction through a distribution stream-of-commerce theory, even if a plaintiff cannot establish jurisdiction under an alter ego theory.   646 F.3d at 596 (citing <u>Anderson</u>, 361 F.3d at 454).   But the Zurich plaintiffs do not pursue their distribution stream-of-commerce personal jurisdiction theory in their objections to the KTV R&R.[27]   The court thus rejects their attempt to rely on <u>Anderson</u> as a method to circumvent the demanding standard for establishing personal jurisdiction on an alter ego theory.

The court next rejects the magistrate judge's skepticism of applying alter ego jurisdiction from a subsidiary to a parent corporation.   (Docket 67 at p. 34). As the Court of Appeals for the Ninth Circuit explained, "[b]ecause [courts] treat the parent and subsidiary as not really separate entities if they satisfy the alter ego analysis, there is no greater justification for bringing the parent into the subsidiary's forum than for doing the reverse."   <u>Ranza v. Nike, Inc.</u>, 793 F.3d 1059, 1072 (9th Cir. 2015) (internal quotation & citation omitted).   This logic

---

[27]In any event, the court would reject the theory for the reasons stated above.   <u>See</u> <u>supra</u> Section II.B.1.   There is even less evidence showing KTV intended to specifically contact South Dakota as a forum through tire distribution than there was for KTCI.

has force.   The salient factor is not, as the magistrate judge held, in which direction the power in the relationship between two corporations flows.   The correct inquiry is whether one corporation maintains such control over the other as to render both corporations essentially the same.   Epps, 327 F.3d at 648-49.

With the proper framing in place, the court turns to whether the record shows KTV is KTUSA's alter ego.   It does not.   The main piece of evidence in the record evincing any connection at all between KTV and KTUSA is that KTUSA issued recalls of defective tires manufactured by KTV.   The record is not even clear as to whether KTUSA directly purchases tires from KTV.   See Docket 112 at p. 6 ("When KTUSA purchases tires from KTCI . . . .").   The court cannot possibly extrapolate the necessary degree of control from evidence of two tire recalls.

Perhaps recognizing this, the Zurich plaintiffs' primary argument is that KTV is part of a Kumho "single enterprise[,]" all parts of which are subject to personal jurisdiction in South Dakota by virtue of their efforts "to distribute Kumho-branded tires to the U.S. market and South Dakota."   (Docket 68 at p. 13).   The record evidence of KTV's relationship with KTCI is slim.   In its 2011 annual report, KTCI stated it "provided guarantees" for KTV in the amount of $186.1 million.   (Docket 48-2 at p. 3).   KTCI lists KTV's factory in promotional materials, transports injured KTV employees to South Korea for medical treatment and opened a Korean language school in Vietnam.   It is apparent the

two companies are connected, but these facts do not speak to whether their relationship is one of control or cooperation.

Given the paltry state of the record, jurisdictional discovery is warranted. See Viasystems, 646 F.3d at 598 (discovery warranted where facts "necessary to resolving the jurisdictional inquiry are . . . unknown[.]").  The Zurich plaintiffs filed an affidavit outlining their jurisdictional discovery requests as to KTV. (Docket 47).   In light of the Zurich plaintiffs' concessions in their objections and the court's above rulings, some of the requests are excessive.   For example, the Zurich plaintiffs waived any attempt to establish specific personal jurisdiction over KTV based on direct connections with South Dakota.   No discovery is necessary on that topic.   Id. at ¶¶ 9(b)-(d), (o).   Moreover, some of the Zurich plaintiffs' proposed discovery requests concern tire manufacturing standards, which go to the merits of the case and not the court's personal jurisdiction over KTV.   Id. at ¶¶ 9(i)-(k).

The court will permit limited jurisdictional discovery as to the nature of the relationships between KTV, KTCI and KTUSA with the following questions at issue.   Do any of these corporations share common officers?   Does KTCI control KTV's internal operations?   Does it direct how KTV's tires are produced or where they are sold?   To what extent does KTCI capitalize KTV or otherwise control its finances?   The court is particularly concerned as to KTV's relationship with KTUSA.   In the event the court finds it does not have personal

41

jurisdiction over KTCI, the Zurich plaintiffs should be prepared to demonstrate KTV's links with KTUSA.

The court will allow 90 days for this tailored jurisdictional discovery.   This deadline will not be extended to allow for in-person depositions of KTV employees.   The court reiterates its expectation that jurisdictional discovery will be written if at all possible.   The Zurich plaintiffs are also reminded of their obligation to limit their discovery requests to jurisdictional facts, not facts relevant only to the merits.

The court sustains the Zurich plaintiffs' objection to the extent they request jurisdictional discovery.

## IV.    Bear Shield Plaintiffs

The Bear Shield plaintiffs' original complaint, which remains in force, named only KTUSA and Kumho Tire Merger as defendants.   (Docket 1).   The complaint was filed on June 1, 2018.   Id.   KTUSA and Kumho Tire Merger filed answers.   (Dockets 6 & 18).   On June 17, 2019—the same day the Zurich plaintiffs filed their separate complaint—the Bear Shield plaintiffs filed an amended complaint naming KTCI as a defendant without leave of court. (Docket 21).   The amended complaint was untimely.   See Fed. Civ. P. 15(a)(1) (allowing amended pleading without leave of court 21 days after service or after service of responsive pleading).   On the unobjected-to recommendation of the magistrate judge, the court dismissed the amended complaint.   (Docket 60).

42

The Bear Shield plaintiffs next filed a motion to amend their complaint without any legal analysis at all.   (Docket 42).   The proposed amended complaint added both KTCI and KTV as defendants.   (Docket 42-1 at p. 1).   The magistrate judge rejected the motion.   (Docket 59).   The Bear Shield plaintiffs did not object to the magistrate judge's order within the allotted time.   However, they later moved to extend the deadline to move to amend a pleading or to reconsider the magistrate judge's decision to deny their motion to amend.[28] (Docket 75).   In support of the motion, the Bear Shield plaintiffs' counsel asserted his former co-counsel was to blame for their procedural errors. (Docket 75-1).   KTUSA and Kumho Tire Merger oppose the motion.   (Docket 86).

The Bear Shield plaintiffs also filed a motion asking the court to add KTCI as a party under Federal Rule of Civil Procedure 21.   (Docket 122).   In support of their motion, they assert they provided notice to KTCI of their claims by serving it under the Hague Convention process for foreign service.   (Docket 122-1).

The court denies these motions.   The court's personal jurisdiction over KTCI and KTV is undetermined.   If the court allowed the Bear Shield plaintiffs to add KTCI and KTV as defendants, the predictable result would be further motions to dismiss for lack of personal jurisdiction.   The Bear Shield plaintiffs would be no better equipped to respond to those motions than the Zurich

---

[28]The deadline for motions to amend a pleading passed on December 3, 2019.   (Docket 28 at p. 2).

plaintiffs have been.[29]   The better course of action is to allow the Zurich plaintiffs to further litigate the personal jurisdiction issues after completing jurisdictional discovery.   Should the court find personal jurisdiction exists over KTCI and KTV, the Bear Shield plaintiffs may then move to amend their complaint.

## V.      Conclusion

The court finds it lacks specific personal jurisdiction over both KTCI and KTV either directly or under the Eighth Circuit's distribution stream-of-commerce theory.   The court further finds the Zurich plaintiffs cannot plead the requisite amount in controversy to establish federal question jurisdiction over their MMWA claims and thus cannot establish personal jurisdiction through those claims.   The MMWA claims will continue in this litigation as supplements to the state law product liability claims.

However, the court cannot determine whether KTCI and KTV are corporate alter egos of KTUSA such that they are subject to personal jurisdiction in this forum.   The court will allow the Zurich plaintiffs 90 days to conduct limited jurisdictional discovery as to the links between KTCI, KTV and KTUSA.   At the close of that period, KTCI and KTV may move again to dismiss the claims against them for lack of personal jurisdiction.   For now, the court denies the pending motions to dismiss without prejudice to renewal.

---

[29]The court notes the Bear Shield plaintiffs do not move to join the Zurich plaintiffs' requests for jurisdictional discovery.

## ORDER

For the reasons given above, it is

ORDERED that the Bear Shield plaintiffs' second motion for reconsideration (Docket 122) is denied.

IT IS FURTHER ORDERED that the Zurich plaintiffs' objections to the magistrate judge's report and recommendation on KTCI's motion to dismiss (Docket 104) are sustained in part and overruled in part.

IT IS FURTHER ORDERED that KTCI's objection to the magistrate judge's report and recommendation on its motion to dismiss (Docket 103) is sustained.

IT IS FURTHER ORDERED that the magistrate judge's report and recommendation on KTCI's motion to dismiss (Docket 102) is adopted in part and rejected in part.

IT IS FURTHER ORDERED that KTCI's motion to dismiss (Docket 79) is denied without prejudice to renewal.

IT IS FURTHER ORDERED that the Bear Shield plaintiffs' first motion for reconsideration (Docket 75) is denied.

IT IS FURTHER ORDERED that the Zurich plaintiffs' objections to the magistrate judge's report and recommendation on KTV's motion to dismiss (Docket 68) are sustained in part and overruled in part.

IT IS FURTHER ORDERED that the magistrate judge's report and recommendation on KTV's motion to dismiss (Docket 67) is adopted in part and rejected in part.

IT IS FURTHER ORDERED that KTV's motion to dismiss (Docket 38) is denied without prejudice to renewal.

IT IS FURTHER ORDERED that the magistrate judge shall reconsider her order on the Zurich plaintiffs' motion to compel (Docket 126) in light of this order.

IT IS FURTHER ORDERED that the Zurich plaintiffs are granted 90 days commencing September 1, 2020, to conduct jurisdictional discovery as described in this order.

Dated August 24, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE